UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK



03  5985

NEXT MILLENIUM REALTY, LLC, and 101 FROST
STREET ASSOCIATES,

               Plaintiffs,

                -v-

ADCHEM CORP., LINCOLN PROCESSING CORP.,
NORTHERN STATE REALTY CORP, NORTHERN
STATE REALTY CO., PUFAHL REALTY CORP.,
JOSEPH PUFAHL, CHARLES PUFAHL, HERMAN
PUFAHL, JOHN PUFAHL, MARVEX PROCESSING
CORP., KORG U.S.A. INC., UNICORD, AUTOLINE
AUTOMOTIVE CORP., COBRALINE
MANUFACTURING, MARKI REALTY, PHYSIO-CHEM,
INC., BRONCO MODEL CRAFT, INC., APPLIED
MAGNETICS and HYMAN HASS,

               Defendants.

_____X

**COMPLAINT AND JURY
DEMAND**

Case No.  CV-03-

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ NOV 2 4 2003 ★

FEUERSTEIN, J.
BROOKLYN OFFICE

ORENSTEIN, M.J.

## NATURE OF ACTION

1.  This is an action under the Comprehensive Environmental Response

Compensation and Liability Act, 42 U.S.C. Section 9601 et seq. ("CERCLA") for contribution

for past and future response costs under Sections 9613(f)(1) and 9613(f)(3)(B), and a declaratory

judgment under Section 9613(g)(2) holding defendants jointly and severally liable for future

response costs incurred by Next Millenium Realty, L.L.C. and 101 Frost Street Associates L.P,

("Plaintiffs") at three hazardous waste sites (the "CERCLA Claims").  Plaintiffs' pendent claims

are pursuant to New York common law (the "Pendent Claims").

## JURISDICTION AND VENUE

2.   This Court has jurisdiction over this matter pursuant to 28 U.S.C. Section 1331 as there is a federal question presented in the CERCLA Claims, and 42 U.S.C. Section 9613.

3.   The facts giving rise to the claims in this action occurred in the County of Nassau and State of New York and within the jurisdiction of the United States District Court for the Eastern District of New York.  At all relevant times, the parties resided and/or conducted business within the jurisdiction of the United States District Court for the Eastern District of New York.

4.   The Pendent Claims are derived from the same common nucleus of operative facts as the CERCLA Claims and the Court may exercise its pendent jurisdiction over the Pendent Claim.

## INTRODUCTION

5.   The New Cassel Industrial Area ("NCIA") is an industrial and commercial manufacturing area located in the Town of North Hempstead, County of Nassau, and State of New York.  The New York State Department of Environmental Conservation ("NYSDEC"), in consultation with the New York State Department of Health ("NYSDOH"), has classified 13 specific properties located within the NCIA as Class 2 Hazardous Waste Sites.  Plaintiffs have entered into three Orders on Consent with the NYSDEC under the Index Numbers W-I 0799-00-05, W-I 0799-00-06 and W-I 0799-00-07 (the "Consent Orders").  These Consent Orders require the remediation of the soil and groundwater at the 89 Frost Street Site, the Former Applied Fluidics Site (770 Main Street) and the Former Autoline Automotive Site (101 Frost Street )

2

(Collectively, the "Frost Street Sites").  Additionally, NYSDEC and the Attorney General's

Office seek contribution from the Plaintiffs for certain off-site groundwater investigative and

remediation costs.

   6. NYSDEC has identified Plaintiffs and certain Defendants as potentially

responsible parties at the Frost Street Sites.  Pursuant to the Consent Orders, NYSDEC has

ordered and the Plaintiffs have agreed to implement an investigation, remedy and cleanup of the

Frost Street Sites.  Moreover, NYSDEC previously conducted an extensive remedial investigation

of the Frost Street Sites and incurred substantial costs.  The Consent Orders require Plaintiffs to

reimburse NYSDEC for these costs.

   7. The Plaintiffs in this action are the current owners of the Frost Street Sites.

The Plaintiffs have incurred and continue to incur response costs at the Frost Street Sites.

   8. The defendants are former operators and/or owners under CERCLA of the

Frost Street Sites and have liability to the Plaintiffs under CERCLA for response costs incurred

and future response costs to be incurred by the Plaintiffs in remediation for the Frost Street Sites.

## PARTIES

### A.  Plaintiff

   9. Plaintiff Next Millenium Realty, L.L.C., is a New York Limited Liability

Company formed under the laws of the State of New York with a principal place of business

located in Nassau County, New York.

   10. Next Millenium Realty, L.L.C. is the current owner of the 89 Frost Street Site

and the 770 Main Street Site.  Next Millenium Realty, L.L.C., has incurred response costs to date

and will incur additional response costs in the future for the remediation of the soil and

3

groundwater on, beneath and originating from the Frost Street Sites. These response costs include amounts paid: (i) for the investigation, study and assessment of the soil and groundwater contamination; (ii) legal counsel; (iii) the implementation of the remedy as required by the NYSDEC for the site and (iv) additional costs associated with the remediation of off-site groundwater. These response costs also include any and all reimbursement of the NYSDEC for past and future costs incurred by the NYSDEC and NYSDOH. These response costs are consistent with the requirements of the National Contingency Plan, 40 C.F.R. Part 300 ("NCP"), and are therefore compensable as necessary costs of response.

11. Plaintiff 101 Frost Street Associates is a New York Limited Liability Company formed under the laws of the State of New York with a principal place of business located in Nassau County, New York.

12. Plaintiff 101 Frost Street Associates L.P. is the current owner of the 101 Frost Street Site.

13. Plaintiff 101 Frost Street Associates L.P. has incurred response costs to date and will incur additional response costs in the future for the remediation of the soil and groundwater on and beneath the 101 Frost Street Site. These response costs also include amounts paid: (i) for the investigation, study and assessment of the soil and groundwater contamination; (ii) legal counsel; (iii) the implementation of the remedy as required by the NYSDEC for the site and (iv) additional costs associated with the remediation of off-site groundwater.. These response costs also include any and all reimbursement of the NYSDEC for past and future costs incurred by the NYSDEC. These response costs are consistent with the requirements of the National Contingency Plan 40 C.F.R. Part 300 ("NCP"), and are therefore

4

compensable as necessary costs of response.

## B. Defendants

### 1. 89 Frost Street Defendants.

14. Pufahl Realty Corp. is or was a corporation formed under the laws of the State of New York with a principal place of business located in Nassau County, New York.

15. Northern State Realty Corp. is or was a corporation formed under the laws of the State of New York with a principal place of business located in Nassau County, New York.

16. Northern State Realty Co. is or was a partnership formed under the laws of the State of New York with a principal place of business located in Nassau County, New York. The partners of Northern State Realty Co. at all relevant times consisted of Charles Pufahl, Herman Pufahl and Joseph Pufahl. Upon information and belief, John Pufahl later obtained a successor interest in the partnership.

17. Adchem Corp. is or was a corporation formed under the laws of the State of New York with a principal place of business located in Suffolk County, New York.

18. Lincoln Processing Corp. is or was a corporation formed under the laws of the State of New York with a principal place of business located in Nassau County, New York.

19. Upon information and belief, Joseph Pufahl is an individual who at all relevant times resided and conducted business in Nassau County, New York.

20. Upon information and belief, Charles Pufahl is an individual who at all relevant times resided and conducted business in Nassau County, New York.

21. Upon information and belief, Herman Pufahl is an individual who at all relevant times resided and conducted business in Nassau County, New York.

22. Upon information and belief, John Pufahl is an individual who at all relevant times resided and conducted business in Nassau County, New York.

23. Marvex Processing & Finishing Corp. ("Marvex") is or was a corporation formed under the laws of the State of New York that conducted business at all relevant times in Nassau County, New York.

24. Korg U.S.A., Inc. ("Korg") is or was a corporation formed under the laws of the State of Delaware, authorized to conduct business in the State of New York as a foreign corporation. Korg is the successor of the assets and liabilities of Unicord, Inc. At all relevant times, Korg and Unicord, Inc. conducted business in the County of Nassau, New York.

**2. Former Autoline Automotive Site Defendants**

25. Upon information and belief, Autoline Automotive Corp. regularly conducts or conducted business in Nassau County, New York at all relevant times for purposes of this action; the wrongdoing committed by this Defendant occurred in Nassau County, New York.

26. Upon information and belief, Cobraline Manufacturing Corp. regularly conducts or conducted business in Nassau County, New York at all relevant times for purposes of this action; the wrongdoing committed by this Defendant occurred in Nassau County, New York.

27. Upon information and belief, Physio-Chem, Inc. regularly conducts or conducted business in Nassau County, New York at all relevant times for purposes of this action; the wrongdoing committed by this Defendant occurred in Nassau County, New York.

28. Upon information and belief, Bronco Model Craft, Inc., regularly conducts or conducted business in Nassau County, New York at all relevant times for purposes of this action; the wrongdoing committed by this Defendant occurred in Nassau County, New York.

### 3. Former Applied Fluidics Site

29. Applied Magnetics, Inc. is a corporation formed under the laws of the State of New York with a principal place of business located in Suffolk County, New York.

30. Upon information and belief, Hyman Hass, the owner of Applied Magnetics, Inc., is an individual who at all relevant times resided and regularly conducted business in Nassau County, New York.

31. The corporate address of Applied Magnetics is 103 Rome Street, Farmingdale, New York 11735. Applied Magnetics' registered agent is CT Corporation System, 111 Eighth Avenue, New York, New York 10011.

## FACTUAL BACKGROUND
### I. 89 Frost Street Site

32. The 89 Frost Street Site is comprised of approximately 2.1 acres of land located at 89 Frost Street in North Hempstead, Nassau County.  The 89 Frost Street Site is bounded by the Autoline Site to the North and the Applied Fluidics Site to the Southwest.

33. An approximately 55,000 square foot facility located on the property was utilized by the defendants for commercial manufacturing between approximately 1965 when the building on the site was erected through 1992 when the structures on the site were demolished.

34. Following numerous environmental investigations and assessments of the area by NYSDEC and its consultants, a Record of Decision ("89 Frost Street ROD") was compiled and released by the NYSDEC for the 89 Frost Street Site in March 2000.

35. The environmental investigations carried out by the NYSDEC and its consultants identified numerous volatile organic compounds, semi-volatile organic compounds and metals present on the surface, subsurface, and the ground water at the 89 Frost Street Site.

7

The specific compounds present at the site are identified in detail in the 89 Frost Street ROD at pages 6-9 and are incorporated herein by reference (the "Soil Contaminants").

36. The NYSDEC and NYSDOH have selected a remedy for remediation of the soil on the 89 Frost Street Site. The selected remedy requires the removal of contaminated surface soils from the 89 Frost Street Site. Additionally, Soil Vapor Extraction will be utilized to remove contamination from the subsurface under the 89 Frost Street Site. See 89 Frost Street ROD at pages 16-18.

37. A second Record of Decision was issued by the NYSDEC in March 2000 to address the groundwater contamination in the area of the 89 Frost Street Site, Autoline Site and Applied Fluidics Site ("Combined Groundwater ROD").

38. The Combined Groundwater ROD identifies numerous volatile organic compounds in the groundwater under and adjacent to the 89 Frost Street Site. The compounds are identified in detail in Tables 1-4 of the Combined Groundwater ROD and are incorporated herein by reference (the "Groundwater Contaminants").

39. The Combined Groundwater ROD requires extensive remediation of the groundwater beneath and flowing from the three sites. See Combined Groundwater ROD at pages 11-16.

40. NYSDEC released a Proposed Remedial Action Plan ("PRAP") for the NCIA off-site groundwater remediation in May 2003. The remedy identified in the PRAP requires active remediation of the deep water aquifer. As estimated in the PRAP, the cost of this remedy may exceed $6,500,000.

41. In addition to the remediation costs, the NYSDEC seeks reimbursement from

Plaintiffs for all of NYSDEC's past and future costs expended in connection with the 89 Frost Street Site. These costs are currently at $360,236.39 for the on-site costs. NYSDEC seeks additional reimbursement for the off-site groundwater work. The exact amount of the NYSDEC past costs will be known at the time of trial.

## A. Control of 89 Frost Street Site by the Pufahl Entities through 1977

42. Commencing in 1966, Joseph Pufahl, Herman Pufahl, and Charles Pufahl (collectively the "Pufahl Brothers") obtained complete dominion and control over the 89 Frost Street Site. The Pufahl Brothers maintained control of the 89 Frost Street Site through 1977 when they relinquished their rights under the Lease Purchase Agreement dated April 1, 1966 (the "Lease Purchase Agreement") following a fire that destroyed the structure at the 89 Frost Street Site. The Pufahl Brothers controlled the 89 Frost Street Site between 1966 and 1977 through a number of closely controlled entities that include Pufahl Realty Corp., Northern State Realty Corp. and Northern State Realty Co. These entities in turn subleased the premises to other Pufahl Brother entities and Marvex, which directly conducted manufacturing activities at the 89 Frost Street Site until 1976.

43. The Pufahl Brothers initially leased the 89 Frost Street Site through Pufahl Realty Corp. pursuant to the Lease Purchase Agreement. The Lease Purchase Agreement was for a term of twenty years without granting Landlord early termination rights. The Lease Purchase Agreement granted complete dominion and control of the 89 Frost Street Site to the Pufahl Brothers and their related entities. Specifically, the Lease Purchase Agreement required the Pufahl Defendants to pay all fire and liability insurance, taxes and assessments, water and utilities, and costs of repairs and maintenance of the premises, including structural repairs. Moreover, the

9

Pufahl Defendants were given complete discretion to make assignments of the lease and subleases of the premises without the consent of the Landlord and the Pufahl Defendants were given the unconditional right to purchase the property at a predetermined price.

44. Defendant Lincoln Processing Corp., an entity under the Pufahl Brothers' control, guaranteed the obligations under the Lease Purchase Agreement.

45. Shortly after entering into the Lease Purchase Agreement, the Pufahl Brothers changed the name of the Pufahl Realty Corp. to Northern State Realty Corp.  At some point before 1973, Northern State Realty Co., a partnership comprised of the Pufahl Brothers, assumed all rights and obligations under the Lease Purchase Agreement.

46. On or about 1977, Northern State Realty Co. commenced an action in the Supreme Court of New York State seeking enforcement of its right to purchase the 89 Frost Street Site pursuant to the terms of the Lease Purchase Agreement. The litigation was concluded when the Pufahl Brothers, Pufahl Realty Corp., Northern State Realty Corp, Northern State Realty Co., Lincoln Processing Corp. and Adchem Corp. (collectively, the "Pufahl Defendants") all executed a settlement agreement as Lessees.

47. Upon information and belief, the Pufahl Brothers exercised complete dominion and control over the entities that occupied the 89 Frost Street Site.  Specifically, Pufahl Realty Corp., Northern State Realty Corp., Northern State Realty Co., Lincoln Processing Corp. and Adchem Corp. were, at all relevant times, alter-egos of the Pufahl Brothers.  The Pufahl Brothers randomly conducted business and manufacturing at the 89 Frost Street Site through one or more of their entities at all times between 1966 and 1977.

10

## B.  Manufacturing Activity at 89 Frost Street

48. Upon taking possession of the 89 Frost Street Property in 1966, the Pufahl Defendants began conducting manufacturing at the 89 Frost Street Property.  Upon information and belief, the initial manufacturing at the facility was conducted by a joint venture between two of the Pufahl defendants, Lincoln Processing Corp. and Adchem.  The Pufahl Defendants conducted a single enterprise at the site pursuant to which certain Pufahl Defendants provided products and assisted other defendants in the manufacturing of products that were marketed through the Pufahl Defendants.

49. Upon information and belief, many of the soil and groundwater contaminants identified in the 89 Frost Street ROD were utilized in the manufacturing processes carried out by the Pufahl Defendants at the 89 Frost Street Site.  Specifically, many of the organic compounds identified in the ROD were utilized by the Pufahl Defendants for cleaning products and equipment. Upon information and belief, these materials were discharged by the Pufahl Defendants into its septic system that discharged into a number of drywells and storm water drywells located on the 89 Frost Street Site.  Moreover, many of the heavy metals and semi-volatile compounds found in materials used by the Pufahl Defendants in their manufacturing process have been identified in the 89 Frost Street ROD as present in the soil and groundwater. Upon information and belief, the Pufahl Defendants also discharged these compounds in the on-site sanitary and leaching systems, and storm water drywells.

50. On or about 1970, Adchem executed a Lease Addendum wherein the stated use of the property was for manufacturing operations at the site.  Upon information and belief, at or about that time, Adchem was directly engaged in manufacturing at the 89 Frost Street Site.

11

51.   Upon information and belief, during Adchem's occupancy of the 89 Frost Street Site, it discharged its waste containing many of the soil and groundwater contaminants into the on-site sanitary system and drywells.  These contaminants have been identified as present on the 89 Frost Street Site in the 89 Frost Street ROD.

52. On or about 1973, the Pufahl Defendants, through Northern State Realty Co. and/or Adchem Corp., subleased the 89 Frost Street site to Marvex.  Upon information and belief, Marvex utilized solvents in its manufacturing process.  Upon information and belief, Marvex discharged the solvents into the 89 Frost Street sanitary system and storm water drywells.  These solvents have been identified as present on the 89 Frost Street Site in the ROD.

53. At all times between 1978 and 1988, Korg U.S.A., through its acquired subsidiary Unicord, leased the 89 Frost Street Site and conducted manufacturing activities at the site.  Upon information and belief, Unicord utilized solvents, varnishes, and varnish thinners in its manufacturing process.  These materials were discharged and/or spilled by Unicord during its occupancy of the 89 Frost Street Site.  The materials discharged are characteristic of the contaminants identified in the 89 Frost Street ROD as being present at the site.

## II.  101 Frost Street Site State Superfund Site

54.  The 101 Frost Street Site is comprised of approximately 1.7 acres of land located at 101 Frost Street in North Hempstead, Nassau County.

55.  The 101 Frost Street Site is bounded by commercial buildings on the north and west, and the 89 Frost Street Site/Adchem Site on the south.  The 770 Main Street Site/Applied Fluidics Site lies to the west.

56.  A 35,000 square foot facility built in approximately 1962 is still located on the

12

property and was utilized by various defendants for commercial manufacturing during all relevant time periods.

57. Following numerous environmental investigations and assessments of the area by NYSDEC and its consultants, a Record of Decision ("101 Frost Street ROD") was compiled and released by NYSDEC for the 101 Frost Street Site in March of 2000.

58. The environmental investigations carried out by the NYSDEC and its consultants identified numerous volatile organic compounds, semi-volatile organic compounds and metals present on the surface, subsurface, and in groundwater at the 101 Frost Street Site. The specific compounds present at the site are identified in detail in the 101 Frost Street ROD at pages 6-9 and are incorporated herein by reference (the "Soil Contaminants").

59. NYSDEC and NYSDOH have selected a remedy for remediation of the soil on the 101 Frost Street Site. The selected remedy requires the removal of contaminated surface soils from the 101 Frost Street Site. Additionally, soil vapor extraction will be utilized to remove contamination from the subsurface under the 101 Frost Street Site. See 101 Frost Street ROD at pages 16-18.

60. A second Record of Decision was issued by the NYSDEC in March of 2000 to address the groundwater contamination in the area of the 89 Frost Street Site, Autoline Site and Applied Fluidics Site ("Combined Groundwater ROD").

61. The Combined Groundwater ROD identifies numerous volatile organic compounds in the groundwater under and adjacent to the 101 Frost Street Site. The compounds are identified in detail in Tables 1-4 of the Combined Groundwater ROD.

62. The Combined Groundwater ROD requires extensive remediation of the

13

groundwater beneath and flowing from the three sites. See Combined Groundwater ROD at

pages 11-16. As estimated in the Combined Groundwater ROD, the cost of this remedy may

exceed $6,500,000.

63. In addition to the remediation costs, the NYSDEC seeks reimbursement from

the Plaintiffs for all of NYSDEC's past and future costs expended in connection with the 101

Frost Street Site. These costs are currently at $360,236.39. The exact amount of the NYSDEC

past costs will be known at the time of trial.

### 2.    BRONCO MODEL CRAFT, INC./BRONCO MANUFACTURER

64. Upon information and belief, Bronco Manufacturer occupied 101 Frost Street

from approximately 1971-1972.

65. Upon information and belief, Bronco Manufacturer was a company that

manufactured model kits.

66. Upon information and belief, Bronco Manufacturer utilized organic solvents

and other hazardous materials when operating at 101 Frost Street.

67. Upon information and belief, many of the soil and groundwater contaminants

identified in the 101 Frost Street ROD are believed to have been utilized in the manufacturing

processes carried out by Bronco Manufacturer and/or their related companies.

68. Upon information and belief, these materials were discharged by Bronco

Manufacturer into its septic system that discharged into a number of drywells located on the 101

Frost Street Site.

69. Upon information and belief, Bronco Manufacturer also discharged these

compounds in the on-site sanitary and leaching systems.

14

70. Upon information and belief, two drywells/cesspools are believed to have existed in the western portion of the 101 Frost Street site; PCE and TCA and related compounds were found in high concentrations in the groundwater in this area of the site.

71. Upon information and belief, Bronco Manufacturer discharged wastes into the drywells and cesspool on or near the 101 Frost Street Site.

## 3.     PHYSIO-CHEM CORPORATION

72. Upon information and belief, Physio-Chem Corporation occupied 101 Frost Street from approximately 1964-1972.

73. Upon information and belief, Physio-Chem Corporation was a company who manufactured toys.

74. Upon information and belief, Physio-Chem Corporation utilized organic solvents and other hazardous materials at 101 Frost Street.

75. Upon information and belief, many of the soil and groundwater contaminants identified in the 101 Frost Street ROD are believed to have been utilized in the manufacturing processes carried out by Physio-Chem Corporation and/or its related companies.

76. Upon information and belief, these materials were discharged by Physio-Chem Corporation into its septic system that discharged into a number of drywells located on the 101 Frost Street Site.

77. Upon information and belief, Physio-Chem Corporation also discharged these compounds in the on-site sanitary and leaching systems.

78. Upon information and belief, two drywells and cesspools are believed to have existed in the western portion of the 101 Frost Street site; PCE and TCA, related compounds

15

were found in high concentrations in the groundwater in this area of the site.

79. Upon information and belief, Physio-Chem Corporation discharged wastes into the cesspool on or near the 101 Frost Street Site.

### III. 770 Main Street Site State Superfund Site

80. The 770 Main Street Site is located in North Hempstead, Nassau County. The Site is bounded by the Autoline Site and the Former Adchem Site to the Southeast.

81. Following numerous environmental investigations and assessments of the area by NYSDEC and its consultants, a Record of Decision ("770 Main Street ROD") was compiled and released by the NYSDEC for the site on March 2000.

82. The environmental investigations carried out by the NYSDEC and its consultants identified numerous volatile organic compounds, semi-volatile organic compounds and metals present in the shallow soil, deep soil and groundwater on the 770 Main Street Site. The specific compounds present at the site are identified in detail in the 770 Main Street ROD.

83. The NYSDEC and NYSDOH have selected a remedy for remediation of the soil on the 770 Main Street Site. The selected remedy requires the removal of contaminated shallow soils from the 770 Main Street Site.

84. A second Record of Decision was issued by the NYSDEC on March 2000 to address the groundwater contamination in the area of the 770 Main Street Site, Autoline Site and Adchem Site ("Combined Groundwater ROD").

85. The Combined Groundwater ROD identifies numerous volatile organic compounds in the groundwater under and adjacent to the site. The compounds are identified in detail in Tables 1-4 of the Combined Groundwater ROD

16

86. The Combined Groundwater ROD requires extensive remediation of the groundwater beneath and flowing from the three sites. As estimated in the Combined Groundwater ROD, the cost of this remedy may exceed $6,500,000.

87. In addition to the remediation costs, the NYSDEC seeks reimbursement from the Plaintiffs for all of its past and future costs expended in connection with the 770 Main Street Site by NYSDEC. The exact amount of the NYSDEC past costs will be known at the time of trial.

## A. Control of 770 Main Street Site by Hyman Hass

88. Upon information and belief, Applied Fluidics, Inc., ("AFI"), a division of Allard Instruments, occupied the 770 Main Street Site from approximately 1974 until 1982.

89. Defendant, Hymann Hass, is identified in corporate filings as AFI's company incorporator and president.

90. Upon information and belief, AFI was under the complete dominion and control of Hymann Hass and was his alter ego.

91. Upon information and belief, Applied Magnetics, Inc. was incorporated in New York on February 27, 1992.

92. Upon information and belief, shortly after its incorporation, the assets and liabilities of AFI were transferred into Applied Magnetics, Inc. and the company continued the business of AFI under the new name.

93. AFI was then dissolved on September 27, 1995.

94. Upon information and belief, Hymann Hass exercised dominion and control over all of the entities listed above.

95. Upon information and belief, Hymann Hass exercised dominion and control over

the entities that occupied the 770 Frost Street Site from the time periods of 1969 until at least 1982. Specifically, at all relevant times, Hymann Hass conducted business and manufacturing at the 770 Frost Street Site through one or more of his entities at the time periods outlined above.

**B.  Manufacturing Activity at 770 Main Street Site**

96. Upon taking possession of the 770 Main Street Site, Defendants were in control of manufacturing which occurred at the Site.

97. According to records maintained by Environmental Data Resources, Defendants used the hazardous substances TCE and PCE.

98. Upon information and belief, these materials were discharged by the Defendants into its septic system that discharged into a number of drywells located on the Site.  Moreover, many of the materials used by the Defendants in their manufacturing processes have been identified in the ROD as present in the soils and groundwater, including high concentrations of PCE.  Upon information and belief, the Defendants also discharged these compounds in the on-site sanitary and leaching systems.

**C. Piercing the Corporate Veil and Continuing Enterprise**

99. Plaintiffs restate and re-allege all allegations contained in paragraphs 1- 98 as if fully set forth herein.

100.     As outlined above, upon information and belief, the aforementioned corporations which are now dissolved were owned and operated by Hymann Hass.  Upon information and belief, the same type of business which was previously conducted at 770 Main Street (ie. Applied Fluidics, Inc., and Allard Instruments) continues to date and is run under the name "Applied Magnetics Inc."

18

101. Additionally, upon information and belief, Applied Magnetics shares common owners, managers, employees, board of directors and supervisors, and Applied Magnetics manufactures virtually the same products as AFI.

102. Applied Magnetics has liability in this case as continuing enterprise of AFI and Allard.

103. Hyman Hass had complete dominion and control over AFI and Allard Instruments. These corporations are alter egos of Hyman Hass. As such, Hyman Hass has liability for the acts of AFI.

## FIRST CAUSE OF ACTION:
### CERCLA Contribution Under 42 USC Section 9613(f)(1)
### (89 Frost Street Site)

104. Plaintiffs restate and re-allege all allegations contained in paragraphs 1-103 as if fully set forth herein.

**A. 89 Frost Street is a Facility**

105. The site located at 89 Frost Street is a facility as defined by 42 U.S.C. Section 9601(9). The 89 Frost Street site is or was at all relevant times comprised of numerous pits, wells, leaching pools, ditches, storm or water drains, and/or lagoons wherein hazardous substances have been deposited, disposed, placed and/or are located.

106. Both the Combined Groundwater ROD and 89 Frost Street ROD identify and document hazardous waste disposal on the 89 Frost Street Site property through the sanitary system and other systems. As such, the 89 Frost Street Site is a "Facility" under CERCLA.

**B. Hazardous Substances Have Been Released at the 89 Frost Street Site Facility**

107. At all relevant times during the Pufahl Defendants' and Marvex's operation

of the 89 Frost Street Site, there was no public sewer service for the site. All effluent generated by these defendants at the 89 Frost Street site was disposed of by pumping, pouring, emitting, emptying, discharging, dumping and disposing of the commercial waste generated by the defendant operators into the septic, storm water system, and leaching systems that serviced the 89 Frost Street site.

108.    Upon information and belief, Korg and its affiliates conducted operations at the 89 Frost Street Site that resulted in the spilling and discharging of certain soil and groundwater contaminants into the site, soil, groundwater, and drywells.

109.    The operations conducted by the defendants at the 89 Frost Street Site generated hazardous substances as defined by 42 U.S.C. Section 9601(14). The hazardous substances were released at the 89 Frost Street Site by the defendants by their disposal of the hazardous substances into the sanitary septic, leaching system and onto the soils.

110.    Many of the hazardous substances generated by the defendants at the 89 Frost Street site have been identified by the NYSDEC as present at the site.

111.    In addition to the hazardous substances discharged into the septic system, and stormwater drains, quantities of hazardous substances were spilled by the operator defendants and discharged through floor drains present in the building formerly located at the 89 Frost Street site.

112.    These activities and other activities yet to be identified constitute a disposal of hazardous substances at the 89 Frost Street Site by the defendants.

C. **89 Frost Street Occupants/Defendants Are Responsible Parties Under Section 9607(a)(2)**

113.    At the time of the release, each of the defendants who occupied 89 Frost

Street either directly, in concert with other defendants, or through alter ego entities, managed, directed, or conducted operations at the 89 Frost Street Site that resulted in the releases of hazardous substances at the facility.

114.    In addition to the operator liability under Section 9607(a), the Pufahl Defendants have liability as owners of the property.  Specifically, the Lease Purchase Agreement granted complete dominion and control and all the rights and obligations of ownership to the Pufahl Defendants.

115.    The Lease Purchase Agreement conferred many indicia of ownership and control on the Pufahl Defendants, including: (1) an extended term of twenty years without granting Landlord early termination rights; (2) a grant of complete control of the 89 Frost Street Site to the Pufahl Brothers and their related entities; (3) no restrictions on use; (4) a requirement for the Pufahl Defendants to pay all fire and liability insurance, taxes and assessments, water and utilities, and costs of repairs and maintenance of the premises, including structural repairs for the property; (5) the complete discretion to make assignments of the lease and subleases of the premises without the consent of the Landlord; and (6) the right to purchase the property at a predetermined price.

116.    Pursuant to the terms of the Lease Purchase Agreement, the Pufahl Defendants had sufficient indicia of ownership to be de facto owners under CERCLA and are strictly liable for any CERCLA response costs incurred or to be incurred at the 89 Frost Street Site.

**D.  Plaintiffs Have Incurred Response Costs**

117.    Plaintiffs have incurred response costs to date and will incur additional

21

response costs in the future for the remediation of the soil and groundwater on and beneath the 89

Frost Street Site. These response costs include amounts paid for the investigation, study and

assessment of the soil and groundwater contamination and the implementation of the remedies as

required by the NYSDEC for the site. These response costs include any and all reimbursement of

the NYSDEC for past and future costs incurred by the NYSDEC.

### E. The Response Costs Conform to the National Contingency Plan

118.    The response costs incurred, and to be incurred by the plaintiffs are

consistent with the requirements of the National Contingency Plan.

### SECOND CAUSE OF ACTION:
### CERCLA Contribution Under 42 USC Section 9613(f)(1)
### (101 Frost Street Site)

### A. 101 Frost Street is a Facility

119.    Plaintiffs restate and re-allege all allegations contained in paragraphs 1-119

as if fully set forth herein.

120.    The site located at 101 Frost Street is a facility as defined by 42 U.S.C.

Section 9601(9). The 101 Frost Street site is comprised of numerous pits, wells, leaching pools,

ditches, and/or lagoons wherein hazardous substances have been deposited, disposed, placed

and/or are located.

121.    Both the Combined Groundwater ROD and 101 Frost Street ROD identify

and document hazardous waste disposal on the 101 Frost Street Site property through the

sanitary system and other systems. As such, the 101 Frost Street Site is a "Facility" under

CERCLA.

22

**B. Hazardous Substances Have Been Released at the 101 Frost Street Site Facility**

122.    Upon information and belief, at all relevant times during the Defendants' operation of the 101 Frost Street Site, there was no public sewer service for the site. All effluent generated by the defendants at the 101 Frost Street site was disposed of by pumping, pouring, emitting, emptying, discharging, dumping and disposing of the commercial waste generated by the defendant operators into the septic and leaching system, and storm water system that serviced the 101 Frost Street site.

123.    Upon information and belief, Defendants and their affiliates conducted operations at the 101 Frost Street Site that resulted in the spilling and discharging of certain soil and groundwater contaminants on or into the soil and groundwater of the site.

124.    The operations conducted by the Defendants at the 101 Frost Street Site generated hazardous substances as defined by 42 U.S.C. Section 9601(14). The hazardous substances were released on the 101 Frost Street Site by the defendants by their disposal of the hazardous substances into the sanitary septic, leaching and storm water systems and onto the soils.

125.    Many of the hazardous substances generated by the defendants at the 101 Frost Street site have been identified by the NYSDEC as present at the site.

126.    In addition to the hazardous substances discharged into the septic system, quantities of hazardous substances were spilled by the operator defendants and discharged through floor drains present in the building formerly located at the 101 Frost Street site.

127.    These activities and other activities yet to be identified constitute a disposal of hazardous substances at the 101 Frost Street Site by the defendants.

23

## C.  Plaintiffs Have Incurred Response Costs

128.    Plaintiffs have incurred response costs to date and will incur additional response costs in the future for the remediation of the soil and groundwater at and beneath the 101 Frost Street Site. These response costs include amounts paid for the investigation, study, and assessment of the soil and groundwater contamination and the implementation of the remedy as required by the NYSDEC for the site.  These response costs include any and all reimbursement of the NYSDEC for past and future costs incurred by the NYSDEC.

## D.  The Response Costs Conform to the National Contingency Plan

129.    The response costs incurred, and to be incurred by the plaintiffs are consistent with the requirements of the National Contingency Plan.

**THIRD CAUSE OF ACTION:**
**CERCLA Contribution Under 42 USC Section 9613(f)(1)**
**(770 Main Street Site)**

## A.  770 Main Street Site is a Facility

130.    Plaintiffs restate and re-allege all allegations contained in paragraphs 1-130 as if fully set forth herein.

131.    The site located at 770 Main Street is a facility as defined by 42 U.S.C. Section 9601(9).  The 770 Main Street site is comprised of numerous pits, wells, leaching pools, ditches, and/or lagoons wherein hazardous substances have been deposited, disposed, placed and/or are located.

132.    Both the Combined Groundwater ROD and 770 Main Street ROD identify and document hazardous waste disposal on the 770 Main Street Site property through the sanitary system and other systems.  As such, the 770 Main Street Site is a "Facility" under CERCLA.

24

**B. Hazardous Substances Have Been Released at the 770 Main Street Site Facility**

      133.    Upon information and belief, at all relevant times during the Defendants' operation of the 770 Main Street site, there was no public sewer service for the site. All effluent generated by the Defendants at the 770 Main Street site was disposed of by pumping, pouring, emitting, emptying, discharging, dumping, and disposing of the commercial waste generated by the defendant operators into the septic and leaching system that serviced the 770 Main Street site.

      134.    Upon information and belief, Defendants and their affiliates conducted operations at the 770 Main Street Site that resulted in the spilling and discharging of certain soil and groundwater contaminants on or into the soil and groundwater of the site.

      135.    The operations conducted by the Defendants at the 770 Main Street Site generated hazardous substances as defined by 42 U.S.C. Section 9601(14). The hazardous substances were released on the 770 Main Street Site by the defendants by their disposal of the hazardous substances into the sanitary septic, leaching system and storm water system, and on or into the soils.

      136.    Many of the hazardous substances generated by the defendants at the 770 Main Street site have been identified by the NYSDEC as present on the site.

      137.    In addition to the hazardous substances discharged into the septic system, quantities of hazardous substances were spilled by the operator defendants and discharged through floor drains present in the building formerly located at the 770 Main Street site.

      138.    These activities and other activities yet to be identified constitute a disposal of hazardous substances at the 770 Main Street Site by the defendants.

**C. Plaintiffs Have Incurred Response Costs at 770 Main Street Site**

139.    Plaintiffs have incurred response costs to date and will incur additional response costs in the future for the remediation of the soil and groundwater on and beneath the 770 Main Street Site. These response costs include amounts paid for the investigation, study, and assessment of the soil and groundwater contamination and the implementation of the remedy as required by the NYSDEC for the site. These response costs include any and all reimbursement of the NYSDEC for past and future costs incurred by the NYSDEC.

**D. The Response Costs Conform to the National Contingency Plan**

140.    The response costs incurred, and to be incurred by the plaintiffs are consistent with the requirements of the National Contingency Plan.

**CAUSE OF ACTION:**
**CERCLA Contribution Under 42 USC Section 9613(f)(3)(B)**

141.    Plaintiffs restate and re-allege all allegations contained in paragraphs 1-141 as if fully set forth herein.

142.    As specified above, all the defendants have liability as former operators and owners and are potentially liable persons under CERCLA.

143.    Plaintiffs have resolved a part of their liability to the State of New York for response costs and remedial costs by entering into an administratively approved settlement with the NYSDEC as incorporated in the Consent Orders.

144.    All Defendants have refused to enter into any settlement with the State and are not a party to the Order on Consent despite their status as potentially liable persons under CERCLA.

145.    Plaintiffs are entitled to contribution from the Defendants pursuant to

26

Section 9613(f)(3)(B) for all costs incurred and to be incurred by the plaintiffs pursuant to the terms of the Consent Orders.

## FIFTH CAUSE OF ACTION:
## Declaratory Judgment Pursuant to CERCLA Section 9613(g)(2)

146.    Plaintiffs restate and re-allege all allegations contained in paragraphs 1-146 as if fully set forth herein.

147.    As specified above, the defendants have liability as operators and owners under CERCLA.

148.    Plaintiffs have incurred and will continue to incur response costs for the investigation, study and assessment of the soil and groundwater contamination and the implementation of the remedies as required by the NYSDEC for the sites. These response costs include any and all reimbursement of the NYSDEC for past and future costs incurred by the NYSDEC.

149.    The future response costs will be consistent with the NCP.

150.    Plaintiffs are entitled to a declaratory judgment pursuant to CERCLA Sections 9613(g)(2) holding the defendants responsible for the existence of hazardous substances on the 89 Frost Street Site and liable for the current, future, and past cleanup costs for the 89 Frost Street Site.

## SIXTH CAUSE OF ACTION:
## Common Law Nuisance

151.    Plaintiffs restate and allege all allegations contained in paragraphs 1-151 as if fully set forth herein.

152.    Defendants' use, occupation, and operation of the sites has resulted in an

27

intrusion and the continued intrusion upon Plaintiffs' properties, significantly and negatively impacting upon the Plaintiffs' rights to use and enjoy their own property.

153.    Specifically, Defendants' emission, disposal, and release of toxic and hazardous substances into the environment on and around the Plaintiffs' sites were substantially offensive, discomforting, and annoying to persons of ordinary sensibilities, tastes, and habits living in the locality of the sites.  These actions have resulted in the listing of the sites as State Superfund Sites.

154.    Defendants' interference with Plaintiffs' rights was so unusual and excessive that it necessarily caused injury, damage, harm, and inconvenience to Plaintiffs, and it substantially, materially, and unusually interfered with their comfort, and with the proper use and enjoyment of their own property.  Such invasion of Plaintiffs' rights was unreasonable.

156.    Defendants' use, occupation, and operation of the sites has resulted in an entry and intrusion, and the continued entry and intrusion onto the properties of Plaintiffs without privilege, permission, invitation, or justification.  Defendants' conduct directly and proximately caused Plaintiffs' injuries, including actual or increased harm to their property and economic interests.  Plaintiffs are entitled to recover damages for such injuries.

157.    All injuries and damages to Plaintiffs are substantial.  Many of the injuries to the Plaintiffs, however, are as yet undetermined quantitatively.  The amount of damages for some of the injuries will be established at the time of trial.

WHEREFORE, plaintiffs demand judgment against defendants as follows:

On the First Cause of Action in the sum of ten million dollars ($10,000,000.00); and

28

On the Second Cause of Action in the sum of ten million dollars ($10,000,000.00); and

On the Third Cause of Action, a declaration holding the defendants responsible for the existence of hazardous substances on the 89 Frost Street Site and liable for the current and future cleanup costs and past costs for the 89 Frost Street Site; and

On the Fourth Cause of Action, demands judgment against the defendant in the sum of ten million dollars ($10,000,000.00); and

Together with counsel fees, interest and the costs and disbursements of this action and such other and further relief as this Court deems appropriate.

Dated: Cairo, New York
~~July 11, 2003~~
*Nov. 18, 2003*

Kevin E. Maldonado, Esq. (KM7351)
Attorney for Plaintiffs
844 Sunside Road
Cairo, New York 12413
(518) 622-0443

29