UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
STATE OF NEW YORK and DENISE M. SHEEHAN,
as Commissioner of the New York State Department of
Environmental Conservation,

                              Plaintiffs,

                  -against-

NEXT MILLENNIUM REALTY, LLC, 101 FROST
STREET ASSOCIATES, L.P., 101 FROST STREET
CORPORATION, EMILY SPIEGEL, individually, and
as trustee under an agreement of trust for the benefit of
Pamela Spiegel and Lisa Spiegel, JERRY SPIEGEL,
UTILITY MANUFACTURING CO., INC., NEST
EQUITIES, INC., AUDIE KRANZ, WILBUR KRANZ,
ARKWIN INDUSTRIES, INC., DANIEL BERLIN,
THOMAS MALLOY, TISHCON CORP. a/k/a TISHCON
CORPORATION, KAMAL CHOPRA, JOE ELBAZ, C&O
REALTY CO., WILLIAM GROSS, EQUITY SHARE I
ASSOCIATES, GRAND MACHINERY, INC., JERRY
GOODMAN and PAUL MERANDI,

                              Defendants.
------------------------------------------------------------------------X

**REPORT AND
RECOMMENDATION**
CV 03-5985 (SJF)
CV 06-1133 (SJF)

**ORENSTEIN, Magistrate Judge:**

       This is an action brought under the Comprehensive Environmental Response,

Compensation and Liability Act of 1980, as amended by the Superfund Amendments and

Reauthorization Act of 1986 ("SARA"), 42 U.S.C. §§ 9601 *et seq.,* ("CERCLA") and New York

State's common law of public nuisance, indemnification and restitution seeking to recover past

and future response costs incurred by the State in responding to the alleged release and threatened

release of hazardous substances at nine facilities that form the New Cassel Industrial Area

("NCIA") Superfund Site, located in Westbury, New York (the "NCIA Site") and to redress harm

to the public health and environment of the State resulting from defendants' alleged acts and omissions at the NCIA Site. (Amended Compl. ¶¶ 1, 97-126).

Pursuant to the Orders of District Judge Sandra J. Feuerstein, dated November 27, 2006 and December 7, 2006, defendants' Utility Manufacturing Co., Inc., Nest Equities, Inc., Audie Kranz, Wilbur Kranz, Grand Machinery Exchange, Inc. (sued as Grand Machinery, Inc.), Paul Merandi, Arkwin Industries, Inc., Daniel Berlin, Thomas Molloy (sued as Thomas Malloy), Tishcon Corp. a/k/a Tishcon Corporation and Joe Elbaz (hereinafter referred to collectively as "defendants") motion to dismiss plaintiffs' State of New York and Denise M. Sheehan, as Commissioner of the New York State Department of Environmental Conservation (the "DEC"), (collectively "plaintiffs" or the "State") complaint pursuant to Fed. R. Civ. P. 12(b)(6), and defendant Kamal Chopra's (hereinafter referred to as "defendant Chopra")[1] motion to dismiss plaintiffs' complaint pursuant to Fed. R. Civ. P. 12(b)(6) have been referred to the undersigned.

For the reasons that follow, this Court respectfully reports and recommends that defendants and defendant Chopra's motions to dismiss be granted in part and denied in part.

---

[1]Plaintiffs served defendant Chopra with a summons and an amended complaint after defendants' served their initial motion to dismiss the amended complaint. (Def. Chopra's Memorandum of Law, dated October 20, 2006). Defendant Chopra thereafter filed a motion to dismiss the amended complaint and incorporated by reference defendants' arguments set forth in their motion to dismiss as well as proffered an additional ground for dismissal. ( *Id.).* Defendant Chopra joins defendants' Reply Memorandum of Law in Support of Defendants' Motion to Dismiss. ( *Id.*). For purposes of this Report and Recommendation, the Court will address defendant Chopra's motion in conjunction with defendants' motion in the appropriate discussion sections and will address the argument that relates solely to defendant Chopra separately in the appropriate discussion section.

## FACTUAL BACKGROUND

The NCIA is comprised of approximately 170 acres of industrial and commercial properties, which is bounded by the Long Island Railroad, Frost Street, Old Country Road and Grand Boulevard in North Hempstead, Nassau County New York. (Amended Compl. ¶¶ 1-2, 37). The nine manufacturing and commercial facilities that are the subject of this action are a portion of the NCIA complex. (*Id.*). The United States Environmental Protection Agency (the "EPA") has identified a sole-source aquifer under the Site, and groundwater underlies the NCIA Site at a depth of approximately 60 feet. (*Id.* at ¶ 38). In addition, there are two public water supply wells located approximately 1,500 feet downgradient[2] of the NCIA. (*Id.*).

According to the amended complaint, the disposal of hazardous substances at each of the nine facilities have contaminated the soil and groundwater at and in the vicinity of each facility. (*Id.* at ¶ 2). As the contaminants from each of the facilities commingled, they formed a plume of pollutants that has migrated from the NCIA sites and has contaminated the nearby Bowling Green Water District public water supply wells, thus threatening the environment and public health. (*Id.*). Defendants are alleged to be the current owners and/or operators of the nine facilities and/or the successors to the entities that owned or operated the NCIA Sites at the time of the disposal of hazardous substances. (*Id.*).

Development of the NCIA dates back to early 1950 and commercial activities at that area have resulted in groundwater contamination by volatile organic compounds ("VOC"). (*Id.* at ¶ 39). In August 1988, the DEC placed the entire NCIA properties on the New York State

---

[2]Downgradient refers to the direction that groundwater flows. (Pls. Memorandum of Law in Opposition, at 5 n. 2).

Registry of Inactive Hazardous Waste Disposal sites (the "Registry") based on an initial groundwater investigation that the Nassau County Department of Health conducted which revealed the presence of VOCs in the groundwater. (*Id.* at ¶ 40).

DEC retained Lawler, Matusky & Skelly Engineers ("LMS") to conduct Preliminary Site Assessments ("PSAs") to locate sources of groundwater contamination and to identify potentially responsible parties. (*Id.* at ¶ 41). Based upon a PSA conducted in February 1995, the DEC delisted the NCIA as a whole in March 1995 and listed seven properties within the NCIA as Class 2 sites.[3] (*Id.*). In 1996, 1997 and 1998, LMS conducted additional PSAs resulting in the DEC listing additional properties within the NCIA as Class 2 sites. (*Id.*).

In remediating Class 2 sites in the NCIA, the DEC employed a three-prong strategy. (*Id.* at ¶ 42). First, the DEC identified on-site source areas of contamination and chose appropriate remedial actions to address these areas. (*Id.*). Second, the DEC investigated the on-site groundwater contamination at each site and chose appropriate remedial actions to address these areas. (*Id.* ). Finally, the DEC investigated off-site groundwater contamination migrating from the Class 2 sites in the NCIA toward the Bowling Green Water District public water supply. (*Id.*).

The DEC conducted an area wide Remedial Investigation/Feasibility Study ("RI/FS") relating to off-site groundwater contamination that was migrating from the Class 2 sites in the NCIA. (*Id.* at ¶ 95). The DEC in 2003 issued its Record of Decision ("ROD") for the NCIA Site's off-site groundwater remediation south of the NCIA Site, called Operable Unit No. 3.

---

[3]Class 2 sites listed on the Registry are those properties that contain hazardous wastes that pose a significant threat to public health or environment. (*Id.* at ¶ 41).

(*Id.*). In its decision, the DEC required the full plume remediation of the Western, Central and Eastern plumes, in the upper and lower portions of the aquifer with in-well vapor stripping/localized vapor treatment. (*Id.*). In November 2005, the DEC issued an Explanation of Significant Differences that separated the sites involved into two distinct groups: those located in the areas of origin of the Eastern and Central plumes, and those located in the area of origin of the Western plume. (*Id.* at ¶ 96).

On March 13, 2006, plaintiffs commenced the instant action[4] in the United States District Court for the Eastern District of New York (*Feuerstein, D.J.*) against defendants (1) seeking recovery costs under § 107 of CERCLA for the completion of the remediation of the off-site groundwater plumes including the costs of investigating and remediating the off-site groundwater contamination in and around the Bowling Green public water supply wells and of responding to releases of hazardous substances at the respective facilities; (2) injunctive relief to abate the contamination in the NCIA and for reimbursement of the State's costs in abating a public nuisance under New York common law; (3) restitution and (4) indemnification. (Amended Compl. ¶¶ 97-126).

Defendants and defendant Chopra (hereinafter collectively "defendants") now move to dismiss plaintiffs' amended complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted arguing that plaintiffs' (1) lack authority to commence this cost recovery action under § 107 of CERCLA; (2) common law claims for restitution,

---

[4] *State of New York et al. v. Next Millennium Realty, LLC et al.*, CV 06-1133 (SJF) (MLO) was consolidated into lead case, *Next Millennium Realty, LLC et al. v. Adchem Corp. et al.*, CV 03-5985 on May 4, 2006 as related actions. *See Order*, dated May 4, 2006 (Feuerstein, D.J.). Case number CV 06-1133 was administratively closed by Order, dated May 4, 2006. *Id.*

indemnification and public nuisance are preempted by plaintiffs' CERCLA claim; (3) CERCLA's claims are time-barred and (4) common law claims are time-barred. Each argument will be addressed in turn.

## DISCUSSION

In considering a motion to dismiss brought pursuant to Fed. R. Civ. P. 12(b)(6), the court accepts as true the allegations in the complaint and construes all reasonable inferences in favor of plaintiff. *See Fernandez v. Chertoff,* 471 F.3d 45, 51 (2d Cir. 2006); *Thomas v. City of New York,* 143 F.3d 31, 37 (2d Cir. 1998). The court should dismiss the complaint only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Fernandez,* 471 F.3d at 51 (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S. Ct. 99, 102 (1957)); *see Morris v. Local 819, Int'l Bh'd of Teamsters,* 169 F.3d 782, 784 (2d Cir. 1999); *Tand v. Solomon Schechter Day School of Nassau County,* 324 F. Supp.2d 379, 382 (E.D.N.Y. 2004).

"In deciding the motion the Court must determine whether the complaint on its face is legally sufficient." *Tand,* 324 F. Supp. 2d at 382. In other words, in order to avoid dismissal, a complaint "must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Cohen v. Litt,* 906 F. Supp. 957, 962 (S.D.N.Y. 1995) (internal quotation marks and citation omitted). At the 12(b)(6) stage, "[t]he issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleading that a recovery is very remote and unlikely but that is not the test." *Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir. 1998) (internal quotation marks and citation omitted); *see*

6

*Leather v. Eyck*, 180 F.3d 420, 424 (2d Cir. 1999).

**(1)     State's Authority to Commence CERCLA Action**

Defendants contend that the State lacks the authority to commence this cost recovery

action under Section 107(a)(4)(A) of CERCLA.  According to defendants, because the State did

not enter into a contract or cooperation agreement with the EPA pursuant to Section 104 of

CERCLA, plaintiffs have no express or implied authority to engage in response actions and seek

liability under CERCLA for their cleanup costs.  Defendants' contention is without merit.

CERCLA is a broad remedial statute that Congress "enacted to ensure the efficient

cleanup of sites contaminated with hazardous wastes and other pollutants." *W.R. Grace & Co. v.

Zotos Int'l, Inc.*, 2005 WL 1076117, at *3 (W.D.N.Y. May 3, 2005).   CERCLA "grants the

President . . . power to command government agencies and private parties to clean up hazardous

waste sites," *Key Tronic Corp. v. United States*, 511 U.S. 809, 814, 114 S. Ct. 1960 (1994), and

provides that "everyone who is potentially responsible for hazardous-waste contamination may

be forced to contribute to the costs of cleanup," *United States v. Bestfoods*, 524 U.S. 51, 56 n.1,

118 S. Ct. 1876 (1998) (internal quotation marks and citation omitted).  *See  Commander Oil

Corp. v. Barlo Equip. Corp.*, 215 F.3d 321, 326 (2d Cir. 2000) (CERCLA sets forth "a regime of

broad-ranging liability, permitting the government to recover its remediation expenses directly

from parties responsible for pollution and authorizing private parties to pursue contribution or

indemnification from potentially responsible parties for expenses incurred responding to

environmental threats") (citations omitted); *see also S. R. No.* 96-848, 96th Cong., 2d Sess. 33

(1980) (CERCLA's expansive liability scheme is intended "to assure that the costs of injuries

resulting from defective or hazardous substances are borne by the persons who create such risks

7

rather than by the injured parties who are powerless to protect themselves"). "As a remedial statute, CERCLA should be construed liberally to give effect to its purposes .... These include facilitating efficient responses to environmental harm." *Benderson Dev. Co. v. Neumade Prods. Corp.*, 2005 WL 1397013, at *13 (W.D.N.Y. June 13, 2005); *see General Elec. Co. v. AAMCO Transmissions, Inc.*, 962 F.2d 281, 285 (2d Cir. 1992) (per curiam) ("It was Congress' intent that CERCLA be construed liberally in order to accomplish [the statute's] goals.").

Specifically, CERCLA provides two distinct legal remedies by which parties that have incurred costs associated with hazardous waste cleanup can recoup some or all of their costs in certain circumstances: (1) cost recovery actions under Section 107(a) and (2) contribution actions[5] under Section 113(f). 42 U.S.C. §§ 9607(a) and 9613(f); *see Cooper Indus. Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 163 & n.3, 125 S. Ct. 577 (2004); *see Schaefer v. Town of Victor*, 457 F.3d 188, 194 (2d Cir. 2006) ("CERLCA permits cost recovery actions under § 107(a) by the government and certain private parties against potentially responsible parties; contribution actions under § 113(f)(1) for parties who have been sued under § 106 or § 107; and contribution actions under § 113(f)(3)(B) for parties that have entered an administrative or judicially approved settlement with the United States or a state").

By its terms, Section 107(a) permits recovery of "all costs of removal or remedial action

---

[5]Congress amended CERCLA in 1986 by way of SARA to expressly authorize a contribution action, stating in relevant part:

> Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title.

42 U.S.C. § 9613(f)(1).

incurred by the United States Government or a State . . . not inconsistent with the [N]ational [C]ontingency [P]lan.[6]" 42 U.S.C. § 9607(a)(4)(A); *see Schaefer*, 457 F.3d at 199. The federal government and the states bring suits pursuant to this provision "to obtain reimbursement for the costs – also known as response costs – of cleaning up and evaluating future contamination at a site." *Consolidated Edison Co. of New York, Inc v. UGI Utilities, Inc.*, 423 F.3d 90, 94 (2d Cir. 2005).

Section 107 defines four classes of potentially responsible parties who may be liable for these costs:

(1)    the owner and operator of a vessel or a facility

(2)    any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3)    any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4)    any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, or a hazardous substance . . . .

42 U.S.C. § 9607(a). Section 107 imposes strict, joint and several liability on all potentially responsible persons for the costs of cleanup. *See B. F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1198 (2d Cir. 1992) ("CERCLA imposes strict liability. Where the environmental harm is indivisible liability is joint and several." ) (citations omitted); *see Bedford Affiliates v. Sills*, 156

---

[6]CERCLA directs the EPA to formulate a National Contingency Plan which outlines the standards and procedures parties must follow in responding to releases of hazardous substances, pollutants and contaminants. 42 U.S.C. § 9605; *see* 40 C.F.R. pt. 300.

F.3d 416, 423 (2d Cir. 1998) (same).

As an initial matter, a fair reading of the plain text of Section 107(a) of CERCLA indicates that the statute does not contain a prerequisite that the State enter a contract or cooperation agreement with the EPA pursuant to Section 104 of CERCLA in order to commence an action to recover its response costs. *See State of New York v. Shore Realty Corp.*, 759 F.2d 1032, 1047-48 (2d Cir. 1985); *see also Washington State Dep't of Transp. v. Washington Natural Gas Co.*, 59 F.3d 793, 801 (9th Cir. 1995) ("Section 107(a) was meant to stand by itself.").

Moreover, the Second Circuit in *Shore Realty Corp.*, explicitly rejected a requirement that a state obtain authorization from the EPA prior to engaging in response actions that were independent from the EPA. 759 F.2d at 1047-48. In *Shore Realty Corp*, the Court stated:

> [W]e reject Shore's argument that the State's response costs are not recoverable because the State has failed to comply with the NCP by not obtaining EPA authorization, nor making a firm commitment to provide further funding for remedial implementation nor submitting an estimate of costs. Shore apparently is arguing that EPA has ruled that the State cannot act on its own and seek liability under CERCLA. We disagree. Congress envisioned states' using their own resources for cleanup and recovering those costs from polluters under section 9607(a)(4)(A). We read section 9607(a)(4)(A)'s requirement of consistency with the NCP to mean that states cannot recover costs inconsistent with the response methods outlined in the NCP. Moreover, the NCP itself recognizes a role for states in compelling potentially responsible parties to undertake response actions independent of EPA and without seeking reimbursement form Superfund. Thus, the NCP's requirements concerning collaboration in a joint federal-state cleanup effort are inapplicable where the State is acting on its own.

*Id.* (internal quotation marks and citations omitted).

Further, defendants' attempt to infer such a requirement based on recent case law wherein claims were brought in those actions pursuant to Section 113(f) of CERCLA, which creates an express cause of action for contribution for parties who have been sued under § 106 or § 107 or for parties who have entered into an administrative or judicially approved settlement with the

United States or a state, *see* 42 U.S.C. § 113(f)(1) and § 113(f)(3)(B), is unavailing. *See, e.g.,*

*W.R. Grace & Co.*, 2005 WL 1076117, at \*4 (holding that a consent order between plaintiff and

DEC did not constitute a settlement of plaintiff's CERCLA liability where there was no

indication that the DEC was operating pursuant to a contract or cooperative agreement with the

EPA); *ASARCO, Inc. v. Union Pacific Railroad Co.*. 2006 WL 173662, at \*7 (D. Ariz. Jan. 24,

2006) (holding "a duly authorized state must follow the same procedures and meet the same

requirements when entering into a CERCLA settlement as when the EPA itself is entering into

such settlements, as the State is simply the agent of the EPA"); *City of Waukesha v. Viacom Int'l,*

*Inc.*, 404 F. Supp.2d 1112, 1118 (E.D. Wis. 2005) (where agreement between city and state failed

to resolve the city's CERCLA liability, the court denied city's motion to amend the complaint to

add a Section 113(f) cause of action).  To be sure, Section 104(d)(1)(A) of CERCLA permits

states to apply to the EPA "to carry out the actions authorized" by CERCLA.  42 U.S.C. §

9604(d)(1)(A).  Moreover, [if] the [EPA] determines that the State . . . has the capability to carry

out any or all of such actions in accordance with the criteria and priorities established pursuant to

section 9605(a)(8) of this title and to carry out related enforcement actions, the [EPA] may enter

into a contract or cooperative agreement with the State . . . to carry out such actions." *Id.*

"[W]here a state receives such delegation, its actions taken pursuant to the cooperative agreement

are on behalf of the Federal government." 42 U.S.C. § 9604(d)(3).

The State in the case at bar, however, is not seeking to exercise any authority under

CERCLA on behalf of the federal government or to commence an action for contribution under

Section 113(f); rather the State is acting on its own, using its own resources to clean up the NCIA

sites and is seeking liability to recover its cleanup costs pursuant to Section 107(a).

Significantly, a court in the same district that decided *W.R. Grace & Co.*, 2005 WL 1076117, at

*4, one of the cases that defendants rely in support of their position, recently explained that:

> [a]lthough a state may not be able to act on behalf of the federal government absent a
> delegation of authority from the EPA, or to completely resolve a party's CERCLA
> liability, § 107(a)(4)(A) contains no requirement that a state obtain authorization from the
> federal government prior to engaging in response actions. States need not obtain EPA
> authorization to clean up hazardous waste sites and recover costs from potentially
> responsible parties.

*Seneca Meadows, Inc. v. ECI Liquidating, Inc.*, 427 F. Supp.2d 279, 287 (W.D.N.Y. 2006)

(internal quotation marks and citations omitted); *see also Washington State Dep't of Transp.*, 59

F.3d at 801.

In short, the fact that the State did not enter into a contract or cooperation agreement with

the EPA for the NCIA sites is of no moment. Inasmuch as the State's allegation in its amended

complaint states that it undertook response actions within the meaning of § 101 (25) of CERCLA

that were consistent with the response methods outlined in the NCP, *see Amended Compl.¶* 102,

it cannot be said that the State was without authority to commence this action to recover its

response costs under §107(a) of CERCLA. *Cf. Pinole Point Properties, Inc. v. Bethlehem Steel

Corp.*, 596 F. Supp. 283, 290 (N.D. Cal. 1984) ("Consistency with the NCP and government pre-

authorization are thus distinct requirements, only the first of which must be satisfied for recovery

under section 107(a)(4)(B)").

Accordingly, the Court respectfully reports and recommends that defendants' motion to

dismiss plaintiffs' CERCLA claim on this ground be denied.

**(2)      Preemption of State Common Law Claims**

Defendants assert that plaintiffs' common law claims for restitution, indemnification and

public nuisance are preempted by plaintiffs' cost recovery claim under § 107 of CERCLA due to a conflict between the state law claims and the federal statutory scheme of CERCLA. According to defendants, these claims do not allege or identify any new or additional relief than that sought under their CERCLA claim, and therefore to allow these state law claims to proceed would by-pass the "elaborate environmental cleanup framework established by Congress" and result in plaintiffs recovering the same response costs twice. (Defs. Memorandum of Law, at 8).

Plaintiffs concede that they are not entitled to recover under state law damages that are also recoverable under CERCLA, but maintain that because the state and federal claims contain different elements, it is not certain that double recovery would result if the claims proceed concurrently. Plaintiffs argue that their cost recovery claim under CERCLA § 107 may fail in whole or in part should it be determined that the State is not entitled to recover certain costs under CERCLA because it cannot demonstrate that the costs expended were consistent with the NCP or if the claims under CERCLA were time-barred, in which case plaintiffs should be allowed to recover those costs under common law theories. Plaintiffs persuasively urge that a dismissal of the state common law claims would be premature at this juncture where at the pleading stage there has not been any recovery of costs to be duplicated and there is the potential for plaintiffs to recover costs under the common law that are not available under CERCLA. (Pls. Memorandum of Law in Opposition, at 17-18).

"The Supremacy Clause of Art. VI of the Constitution provides Congress with the power to preempt state law." *Louisiana Pub. Serv. Comm'n v. Federal Communications Com'n*, 476 U.S. 355, 368-69, 106 S. Ct. 1890 (1986). Thus, "the question whether a certain state action is preempted by federal law is one of congressional intent." *Ingersoll-Rand v. McClendon*, 498

13

U.S. 133, 138-39, 111 S. Ct. 478 (1990) (internal quotation marks and citation omitted). In

order to glean congressional intent, a court may "examine the explicit statutory language and the

structure and purpose of the statute." *Id.* A federal statute may preempt state law in one of the

following ways: (1) "expressly, by explicitly defining in the regulation the extent to which its

enactments preempt State law," (2) "implicitly when Congress has regulated a certain area in a

comprehensive fashion," or (3) "when a State regulation conflicts with federal law, thus

frustrating the purpose of the federal legislation." *Fox v. Cheminova, Inc.*, 387 F. Supp.2d 160,

166 (E.D.N.Y. 2005) (citing *Northwest Central Pipeline Corp. v. State Corp. Com'n. of Kansas*,

489 U.S. 493, 509, 109 S. Ct. 1262 (1989)). "Conflict preemption occurs either when

compliance with both federal and state regulations is a physical impossibility, or where state law

stands as an obstacle to the accomplishment and execution of the full purposes and objectives of

Congress." *Bedford Affiliates*, 156 F.3d at 426 (internal quotation marks and citations omitted).

"Of course, courts should not lightly infer preemption." *International Paper Co. v. Ouellette*,

479 U.S. 481, 490, 107 S. Ct. 805 (1987).

The Second Circuit has held that the express terms of CERCLA as a whole do not

preempt state law, but merely preclude states from "recovering compensation for the same

removal costs or damages or claims under both CERCLA and state or other federal laws,[7] and

---

[7]Although CERCLA states that it is not to "be construed or interpreted as preempting any
State from imposing any additional liability or requirements with respect to the release of
hazardous substances within such State," the statute also precludes (1) "any person who receives
compensation for removal costs or damages or claims pursuant to [the statute] . . . from
recovering compensation for the same removal costs or damages or claims pursuant to any other
State or Federal.law," and (2) "any person who receives compensation for removal costs or
damages or claims pursuant to any other Federal or State law . . . from receiving compensation
for the same removal costs or damages or claims as provided in [CERCLA]." 42 U.S.C. §
9614(a), (b). While § 114(a) of CERCLA purports not to preempt state law, § 114(b) makes

prohibits states from requiring contributions to any fund the purpose of which is to pay

compensation for claims which may be compensated under CERCLA." *Bedford Affiliates*, 156

F.3d at 426 (internal quotation marks and citation omitted). In *Bedford Affiliates*, the Court

stated that "it was not part of the legislative purpose that CERCLA be a comprehensive

regulatory scheme occupying the entire field of hazardous wastes, nor does CERCLA prevent

states from enacting laws to supplement federal measures relating to the cleanup of such wastes."

*Id.* at 426-27. The Court determined, however, that there was an actual conflict between the

statutory settlement scheme pursuant to § 113 and the common law claims of retaliation and

indemnification at issue in that case. *Id.* at 427. Under § 113(f)(2) of CERCLA,[8] potentially

responsible parties who settle are protected from contribution actions asserted against them. *Id.*

The Court observed that "instituting common law restitution and indemnification actions in state

court would bypass this carefully crafted settlement system," thereby creating an actual conflict

and impeding congressional objectives. *Id.* Based on that rationale, the *Bedford Affiliates* Court

concluded that "CERCLA preempts the state law remedies of restitution and indemnification."

*Id.* While defendants in the instant matter rely on this conclusion to support their position, this

Court finds that the case is distinguishable on its facts.

---

clear that a party may not recover the same response costs twice. *Id.*; *see Bedford Affiliates*, 156
F.3d at 426; *New York v. Hickey's Carting, Inc.*, 380 F. Supp.2d 108, 114-15 (E.D.N.Y. 2005).

[8]Section 113(f)(2) states:

A person who has resolved its liability to the United States or a State in an administrative
or judicially approved settlement shall not be liable for claims for contribution regarding
matters addressed in the settlement.

42 U.S.C. § 9613(f)(2).

In contrast to the non-settling PRP plaintiff in *Bedford Affiliates* who was seeking to invoke state law to recover against settling PRPs under § 113(f)(2), here it is the state, not a private responsible party, who is seeking to recover the full extent of response costs under §107(a) against non-settling PRPs who are not entitled at this stage to the contribution protections of § 113(f)(2). Because the *Bedford Affiliates* Court's holding was based on preserving statutory scheme of § 113 for encouraging settlement among private responsible parties, a concern that is not present in a state's cost recovery action under § 107, the actual conflict which supported a finding of preemption in *Bedford Affiliates* does not exist in this matter. *See Hickey's Carting*, 380 F. Supp.2d at 114-15. Thus, the critical issue becomes whether allowing plaintiffs to proceed under state law as well as § 107 of CERCLA defeats a Congressional purpose or objective underlying § 107.

Recently, in a factually similar case, a court in this district addressed this very issue. *See Hickey's Carting*, 380 F. Supp.2d at 114-15. In *Hickey's Carting*, the Court first observed that:

> [w]hat concerned the Second Circuit in *Bedford* was the possibility that potentially responsible parties would choose not to settle their claims with the government out of fear that other defendants could thwart section 113's contribution protection by bringing identical contribution claims under the state common law. It is difficult to see how such a scenario would play out in the context of a cost recovery action by the State under section 107, where there can be no similar fear that once the government has reached a settlement with a potentially responsible party, it will then turn around and bring common law claims against the exact same party, as such settlements are intended to resolve a potentially responsible party's liability to the government and generally contain releases and covenants not to sue for costs arising out of the same hazardous waste cleanup.

*Id.* at 113. The Court found that the holding in *Bedford* did not apply to preempt a state's common law remedies on the basis of conflict preemption principles where the state brought a cost recovery action under § 107. *Id.* at 114 ("In the absence of any true danger that allowing the

State to bring its common law claims for indemnity and restitution along side its CERCLA cost recovery action will undermine the settlement incentives set forth in section 113, *Bedford*'s holding does not apply to preempt Plaintiff's common law claims on the basis of conflict preemption principles.").

Next, the Court in *Hickey's Carting* found that because the state had proffered at least two reasons, namely "CERCLA's NCP requirement and statute of limitations, why it may not be able to recover all of its claims under CERCLA," the danger of double recovery of response costs under its federal and state law claims was avoided. *Id.* at 115 (holding it was "premature at [the pleading] stage to conclude that the potential for Plaintiff's double recovery warrants dismissal of its common law claims"). Finally, the Court examined whether permitting the state to recover under common law if it should fail to meet the NCP requirements or CERCLA's statute of limitations would undermine and/or conflict with CERCLA's purposes and concluded that "the statute should be construed in a way that requires defendants to repay those who clean up their hazardous waste, which in this case tips the balance towards finding that there is no actual conflict between the state common law and CERCLA's NCP requirements." *Id.* at 118.

Likewise, permitting plaintiffs in this case to proceed concurrently under § 107 of CERCLA and common law would not conflict with the settlement scheme or cost recovery scheme of CERCLA nor would it defeat the intent of Congress under CERCLA. *See id.* at 117-18 ("One of CERCLA's overriding goals is to hold polluters responsible for their actions by forcing them to clean up hazardous waste sites and to reimburse the government for such cleanup when it has been done for them."); *see also Manor Care, Inc. v. Yaskin*, 950 F.2d 122, 127 (3d Cir. 1991) ("Congress did not intend for CERCLA remedies to preempt complementary state

remedies"). Plaintiffs have represented that it is conceivable that they might recover costs under state law that may not be recoverable under CERCLA in the event plaintiffs' response costs are determined to be inconsistent with the NCP or if the claims were time-barred.

While it is unclear at this stage of the proceedings which remedies will be supported by the evidence or the extent of relief that will be recoverable under each claims, plaintiffs remain free to plead alternative theories in their complaint so long as these remedies are otherwise available under the law. *See* Fed. R. Civ. P. 8; *Hickey's Carting,* 380 F. Supp.2d at 115-16; *see also Kruse v. Wells Fargo Home Mortgage,* Inc., 383 F.3d 49, 55 n.3 (2d Cir. 2004) ("Federal Rule of Civil Procedure 8(e)(2) permits pleading inconsistent theories in the alternative"); *cf. Adler v. Pataki,* 185 F.3d 35, 41 (2d Cir. 1999) (holding "we have ruled that Rule 8(e)(2) offers sufficient latitude to construe separate allegations in a complaint as alternative theories, at least when drawing all inferences in favor of the nonmoving party as we must do in reviewing orders granting motions to dismiss"). In light of the procedural posture of this case, defendants can reassert their motion at a later stage of the litigation when additional information would be available concerning what costs would be recoverable under each claim. *See Hickey's Carting,* 380 F. Supp.2d at 115-16; *Solvent Chemical Company, ICC Industries v. E.I. Dupont De Nemours & Co.,* 242 F. Supp.2d 196, 211 (W.D.N.Y. 2002) (finding it inappropriate to dismiss plaintiffs' common law claims at the pleading stage where a state law claim may not be duplicative of the CERCLA claims). Under these circumstances, the Court holds that plaintiffs' state law claims are not preempted by CERCLA.

Accordingly, the Court respectfully reports and recommends that defendants' motion to dismiss on this ground be denied.

## (3)     Statute of Limitations Under CERCLA § 107

Defendants assert that plaintiffs' CERCLA § 107 claims are barred by the applicable statute of limitations.   Plaintiffs maintain that their CERCLA claims are timely but appear in the alternative, as discussed *supra*, to allow for the possibility that their federal claims might be time-barred, as they assert the potential inability to succeed in recovering all their response costs under CERCLA as a reason against preempting plaintiffs' common law claims.

There are two kinds of limitations periods governing cost recovery actions under § 107 of CERCLA depending on whether the response costs were incurred in connection with a removal[9] or a remedial action.[10]   42 U.S.C. § 9613(g)(2); *see Schaefer*, 457 F.3d at 195 ("For cost recovery actions under § 107, CERCLA distinguishes between two kinds of response: remedial actions – generally long-term or permanent containment or disposal programs – and removal efforts – typically short- term cleanup arrangements") (internal quotation marks and citation omitted); *see also Shore Realty Corp.,*759 F.2d at 1040.   Section 113(g)(2) of CERCLA provides in pertinent part that:

---

[9]Removal actions are those responses that include "the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release." 42 U.S.C. § 9601(23).

[10]Remedial actions are those "actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of a hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment ." 42 U.S.C. § 9601(24).

19

An initial action for recovery of the costs referred to in [§107] of this title must be commenced –

    (A)    for a removal action, within 3 years after completion of the removal action, except that such cost recovery action must be brought within 6 years after a determination to grant a waiver under [§ 104(c)(1)( C )] of this title for continued response action; and

    (B)    for a remedial action, within 6 years after initiation of physical on-site construction of the remedial action, except that, if the remedial action is initiated within 3 years after the completion of the removal action, costs incurred in the removal action may be recovered in the cost recovery action brought under this subparagraph.

42 U.S.C. § 9613(g)(2). Recently, in *Schaefer*, the Second Circuit set forth a four-part test to establish the initiation of physical on-site construction of a remedial action for CERCLA statute of limitations purposes, requiring the examination of whether the particular response was: (1) a "physical" activity, (2) occurring "on-site," (3) constituting "construction" and (4) which was the "initiation" of a remedial action. 457 F.3d at 195.

While the parties dispute the threshold inquiry of when the State implemented its remedial response at the NCIA, it appears they concede that the State's comprehensive actions at issue were part of a permanent containment effort, *see Shore Realty Corp.,* 759 F.2d at 1040, and were intended "to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment," CERCLA § 101(24), particularly with regard to the on-site and off-site groundwater contamination adversely affecting the Bowling Green public waters supply, *see Amended Compl.* ¶¶ 42, 45-46, 50, 53-54, 58-59, 63-65, 75, 82-83, 88, 93-96. The amended complaint states that the DEC adopted a three-pronged strategy in remediating the Class 2 sites at the NCIA: (1) identifying on-site source areas of contamination at each site and selecting

appropriate remedial actions; (2) investigating the on-site groundwater contamination at and beneath each site and selecting the appropriate remedial actions and (3) investigating the off-site groundwater contamination that is migrating from the Class 2 sites in the NCIA, including groundwater contamination adversely affecting the Bowling Green public water supply and then selecting the appropriate remedial actions for the migration. *Id.* The amended complaint sets forth the operations, environmental conditions and investigation conducted at the individual facilities, but fails to specify the time period in which the state initiated the remedial efforts. *See Amended Compl.* ¶¶ 43-96.

The record is inadequate therefore to address the determinative question of whether the State's CERCLA claims are barred by the applicable statute of limitations. Defendants each raise the statute of limitations as an affirmative defense in their answer to the amended complaint and assert that the initiation of on-site construction of remedial action occurred in 1991 with the installation of carbon units by DEC at the Bowling Green Water District or on June 21, 1995 with the drilling of foundation borings for an air-stripping tower, and that these activities would result in plaintiffs' CERCLA claims being time-barred. (Defs. Memorandum in Support, at 20-21; Defs. Reply Memorandum, at 12). Plaintiffs contest this, asserting that the EPA, not the DEC, was the entity that funded the installation of carbon filters on the Bowling Green Water District Supply wells in 1991, and that the EPA did so expressly as a removal action. (Pls. Memorandum in Opposition, at 28 ). Plaintiffs maintain that prior to July 1995, the only State responses at the NCIA were investigations, not the initiation of on-site construction of remedial action, and that construction of the aeration system commenced after that date. (*Id.*).

In short, the question of when the State commenced its response program for the cleanup

of the NCIA Site for limitations purposes cannot be resolved on this record and the parties need to engage in discovery on the threshold issue regarding the time and manner of the State's recovery actions. *See Hickey's Carting,* 380 F. Supp.2d at 120. Inasmuch as defendants have failed to proffer any evidence beyond the pleadings (1) concerning the dates on which plaintiffs commenced response activities at the NCIA Site and (2) the extent to which such actions constitute the initiation of on-site construction, the Court respectfully reports and recommends that defendants' motion be denied.

Finally, because the Court concludes that the issue of when the state implemented its response efforts for the NCIA Site involve fact questions precluding dismissal of the State's cost recovery action against the defendants on the statute of limitations grounds, the Court likewise concludes that the separate statute of limitations arguments raised by the individual defendants, including defendant Kamal Chopra, cannot be resolved on the pleadings. In addition, the Court finds that because the individual defendants' arguments concerning whether each are an "operator" or "owner" of the Site subject to CERCLA liability involve fact questions that will undoubtedly overlap with the fact issues regarding the time period and manner in which the State commenced its recovery program at the NCIA Site and will require discovery on these issues, dismissal of the State's claims against the individual defendants, including defendant Chopra, is premature. Accordingly, the Court respectfully reports and recommends that the individual defendants' motion, including defendant Chopra's motion, to dismiss plaintiffs' CERCLA claims be denied.

**(4)     Statute of Limitations Under Common Law**

Defendants contend that plaintiffs' state-law claims for public nuisance, restitution and

indemnification are time-barred. According to defendants, plaintiffs failed to bring their public nuisance claim within three years of the date of their discovery of contamination at the NCIA Site pursuant to C.P.L.R. § 214-c, and therefore because the State's public nuisance cause of action is barred by the statute of limitations, the remaining equitable claims for restitution and indemnification require dismissal. The State responds that it has actionable claims for restitution and indemnification that are independent of its common law public nuisance claim. With respect to its public nuisance claim, the State asserts that the limitations set forth in C.P.L.R. § 214-c is inapplicable because the State is not seeking to recover damages under this claim but rather is seeking injunctive relief to abate the contamination at the NCIA Site and is seeking reimbursement of its abatement costs. According to plaintiffs, while the DEC has continually been working to abate the nuisance at the NCIA Sites, hazardous contaminants have continued to threaten the public drinking water supplies and remain a nuisance and therefore the State's public nuisance claim seeking injunctive relief to enjoin defendants to remediate the groundwater contamination as well as its claim for recovery of response costs related thereto is timely.

(a)   **Public Nuisance Cause of Action**

Under common law as it has developed under New York jurisprudence:

> [a] public, or as sometimes termed a common, nuisance is an offense against the State and is subject to abatement or prosecution on application of the proper governmental agency. It consists of conduct or omissions which offend, interfere with or cause damage to the public in the exercise of rights common to all in a manner such as to offend public morals, interfere with use by the public of a public place, or endanger or injure the property, health, safety or comfort of a considerable number of person.

*Copart Industries, Inc. v. Consolidated Edison Co. of New York,* 41 N.Y.S.2d 564, 568, 394 N.Y.S.2d 169, 172 (1977); *see State v. Schenectady Chemicals, Inc.,* N.Y.S.2d 971, 976-77, 117

Misc.2d 960, 965-67 (Sup. Ct. 1983) (upholding under public nuisance law, state claim to compel cleanup of a chemical waste site), *modified*, 479 N.Y.S.2d 1010, 103 A.D.2d 33 (1984); *see also Shore Realty Corp.*, 759 F.2d at 1050-52; *City of New York v. New York Cross Harbor Railroad Terminal Corp.*, 2006 WL 140555, at *18 (E.D.N.Y. Jan. 17, 2006).

Defendants do not appear to dispute the existence of a public nuisance at the NICA Site, and in any event, it is well-established that "the release or threatened release of hazardous waste into the environment infringes upon a public right and [is therefore] a public nuisance as a matter of New York law." *Shore Realty Corp.*, 759 F.2d at 1050-51. Nor do defendants deny that the State has incurred response costs in an effort to abate the nuisance at the NCIA Site. *See Westwood Pharm., Inc. v. National Fuel Gas Distrib. Corp*, 737 F. Supp. 1272, 1281 (W.D.N.Y. 1990)* ("If [plaintiff] can establish . . . that it has incurred response costs . . ., those costs will be sufficient to meet the criterion for bringing a public nuisance claim."). Accepting the allegations in the complaint as true for purposes of this motion, defendants engaged in conduct or omissions that created and/or contributed to or maintained the public nuisance at the Site. *See Amended Compl.*, ¶¶ 8-96; 107-114. Thus, plaintiffs have stated claims for public nuisance and the issue at bar is whether the claims are time-barred.

The statute of limitations for a public nuisance claim in an action to recover damages is set forth in C.P.L.R. § 214-c and provides in pertinent part:

> [T]he three year period within which an action to recover damages for . . . injury to property caused by the latent effects of exposure to any substance or combination of substances, in any form . . . upon or within property must be commenced shall be computed from the date of discovery of the injury by the plaintiff or from the date when through the exercise of reasonable diligence such injury should have been discovered by the plaintiff, whichever is earlier.

24

C.P.L.R. § 214-c (McKinney's 2003). The New York State Court of Appeals had held that the discovery rule contained in this section applies only to actions for damages. *Jensen v. General Elec. Co.*, 82 N.Y.2d 77, 603 N.Y.S.2d 420 (1993).

In *Jensen*, the Court also concluded that under circumstances in which a plaintiff sought injunctive relief in bringing a nuisance claim, the traditional common law rule applied. 82 N.Y.2d at 90-91, 603 N.Y.S.2d 420. "Under common law, a continuing injury to real property gives rise to successive causes of action for the duration of the injury, and the right of the property owner to invoke the equitable power of the court similarly continues, regardless of the lapse of time that might occur before the commencement of legal proceedings." *Town of Oyster Bay v. Occidental Chemical Corp.*, 987 F. Supp. 182, 209-210 (E.D.N.Y. 1997).

Hence, to the extent that the State's claim seeks an injunctive order directing defendants to pay for or carry out any remediation of the NCIA groundwater contamination in the future, *see Amended Compl.*, ¶¶ 107-114, such relief is not in the nature of consequential damages and therefore is not time-barred by C.P.L.R. § 214-c. *Id.* Accordingly, this Court respectfully reports and recommends that defendants' motion to dismiss based on this ground be denied.

On the other hand, where the State seeks to recover costs for harm caused to the on-site land and groundwater by the dumping of hazardous substances, such relief would be in the nature of damages and the State's claim is be subject to the three year statute of limitations period set forth in C.P.L.R. § 214-c.[11] Plaintiffs state in the amended complaint without listing a time

---

[11]Relying on *State of New York v. General Electric Co.*, Index No. 6637-99 (S.C. Albany Co. Apr. 26, 2000), the State argues that the three year limitations period in § 214-c does not apply to bar its nuisance action for abatement because it is seeking to preserve a public right rather than a property right. Defendants disagrees and asserts that the State is not seeking to preserve a public right, but rather is seeking to recover its response costs for the injury to the

period that DEC contracted with LMS to conduct PSAs to identify sources of groundwater contamination and PRPs. (Amended Compl. ¶ 41). Plaintiffs note that in March 1995 DEC delisted the NCIA as a whole but listed seven individual properties within the NCIA as Class 2 sites based upon a 1995 PSA and that LMS conducted additional PSAs in 1996-1998 resulting int DEC listing additional properties within the NCIA as Class 2 Sites. (*Id.*). The amended complaint fails to state which, if any, of the defendants' respective facilities fall within the listed properties.

Nevertheless, with respect to each of defendants' facilities the amended complaint sets forth a description of the State's investigations that were conducted in order to evaluate and/or identify which properties were a source of hazardous waste and/or groundwater contamination. (Amended Compl. ¶¶ 8-94, 107-114). While plaintiffs commenced the instant action on March 13, 2006, the State's discovery of the harm at each of the nine facilities occurred well before the three year limitations period set forth in C.P.L.R. 214-c.

Consequently, to the extent that the State is seeking to recover costs expended for the

---

property. The State's reliance on *General Electric* is misplaced. In *General Electric* , the Court applied a statute of limitations that accrued daily based on its finding that property interests were not at issue and that the State was trying to preserve a property right. *Id.* at 3. In so doing the Court observed that the State was seeking an order directing General Electric to dredge the canal because the State needed an avenue of transportation to facilitate commerce. *Id.* In contrast, here the State is seeking to recover damages expended for its clean-up costs at the Site for the harm done to the land and groundwater by the release of hazardous wastes at the facilities and the Bowling Green public water supply wells. (Amended Compl. ¶¶ 107-114). Consequently, § 214-c is the applicable statute of limitations for plaintiffs' nuisance action for damages. *See New York v. Moulds Holding Corp.*, 196 F. Supp.2d 210, 220 (N.D.N.Y. 2002) (court held three year statute of limitations applied to state's public nuisance cause of action for damages for clean-up costs at a landfill against a successor corporation where corporation had dumped hazardous substances and damaged the land, rather than a daily accrual limitations for actions preserving a public right as urged by the state).

abatement of the nuisance concerning the on-site land and ground contamination at the: (a) Facility at 89 Frost Street, *see* Amended Compl. ¶¶ 43-46 (listing contaminants at the site in RI/FS report finalized in August 1999 and DEC issuing ROD in March 2000 with remedy for contaminated soil); (b) Facility at 770 Main Street, *see* Amended Compl. ¶¶ 47-50 (determining VOC contaminants of concern at property in 1998 RI/FS); ( c) Facility at 101 Frost Street, *see* Amended Compl. ¶¶ 51-54 (listing VOC contaminants of concern at property in 1998 RE/FS and DEC issuing ROD in March 2000 with remedy for contaminated soils); (d) Utility Manufacturing/Wonder-King Facility, *see* Amended Compl. ¶¶ 55-59 (DEC listing property as Class 2 in March 1996); (e) 36 Sylvester Street Facility, *see* Amended Compl. ¶¶ 60-65 (DEC listing property as Class 2 Site in September 1999); (f) Arkwin Industries Facility, *see* Amended Compl. ¶¶ 66-75 (DEC issuing ROD in December 1999 requiring groundwater remediation for contamination); (g) Tishcon Facility at Brooklyn Avenue, *see* Amended Compl. ¶¶ 76-83 (adding property to Registry as Class 2 Site in 1995 and DEC issuing ROD for groundwater contamination at Site in March 2000); (h) Tishcon Facility at 29 New York Avenue, *see* Amended Compl. ¶¶ 84-88 (DEC listing property as Class 2 Site in Registry in March 1998); and ( i) Tishcon Facility at 125 State Street, *see* Amended Compl. ¶¶ 89-94 (Nassau County Health Department requesting contaminated sediment be removed in August 1993 and issuing ROD for site in January 1998), the three year statute of limitations found in C.P.L.R. 214-c applies to bar the State's nuisance action for damages. *See City of New York v. New York Cross Harbor Railroad*, 2006 WL 140555, at *18 (E.D.N.Y. Jan. 17, 2006); *Moulds Holding Corp.*, 196 F. Supp.2d at 220; *Occidental Chemical Corp.*, 987 F. Supp. at 209-210.

Accordingly, this Court respectfully reports and recommends that defendants' motion to

dismiss the State's public nuisance claim for damages be granted.

Finally, with respect to off-site groundwater contamination, the record is not clear as to when the State discovered the injury. *See Amended Compl.* ¶¶ 95-96; 107-114; *Memorandum of Law in Opposition*, at 18-24. Plaintiffs state in their brief that

> [i]n 1988, DEC listed the entire NCIA as a Class 2 site and subsequently delisted the site because it could not at that time identify which properties were the sources of groundwater contamination. Individual *sites* were then listed based on investigations conducted by DEC. State-funded remedial investigations at the NCIA began in 1995 and continued through 2000. DEC also installed early warnings monitoring wells that determine the levels of groundwater contaminants in exceedance of groundwater, drinking water, and surface water standards and guidance values. In 2003, DEC issued a Record of Decision (ROD), which selected the remedy for the NCIA groundwater contamination. The ROD requires, *inter alia,* a remedial design program to determine the components necessary for the construction, operation, and maintenance of a groundwater treatment system in the NCIA, installation of vapor-stripping wells and monitoring wells.

*See Plaintiffs' Memorandum of Law in Opposition,* at 20. The amended complaint merely states without setting forth any time periods for the off-site groundwater contamination that the DEC conducted an area-wide RI/FS relating to off-site groundwater contamination that was migrating from the Class 2 sites in the NCIA and that in 2003, the DEC issued a ROD which required the remediation of three contaminant plumes, the Western, Central and Eastern plumes, in the upper and lower portions of the aquifer with in-well vapor stripping treatment systems. (Amended Compl. ¶ 95).

As with plaintiffs' CERCLA claim, the record is inadequate to make a determination as to when the State can be said to have discovered the harm resulting from the off-site groundwater contamination for purposes of the limitations period. Inasmuch as discovery of the harm triggers the running of the statute of limitations and the question of when the State discovered the injury at the NCIA site with respect to the off-site contamination cannot be clearly resolved on this

record, it is premature to conclude that the State's public nuisance claim for abatement based on the alleged harm emanating from the off-site groundwater contamination is time-barred.

Accordingly, the Court respectfully reports and recommends that the defendants' motion to dismiss the State's public nuisance cause of action on this ground be denied.

### (b)   Indemnification and Restitution Causes of Action

In light of the foregoing, defendants' argument that the State's equitable claims of indemnification and restitution are not actionable as independent claims because plaintiffs' claim of public nuisance is time-barred is unavailing.  In the alternative, defendants argue that regardless of the viability of the State's public nuisance claim, the six-year statute of limitations for indemnity and restitution expired as substantive claims.

"It is a well-settled principle that a person who, in whole or in part, has discharged a duty which is owed by him but which as between himself and another should have been discharged by the other, is entitled to indemnity."  *State of New York v. Stewart's Ice Cream Co.*, 64 N.Y.2d 83, 88, 484 N.Y.S.2d 810, 812 (1984); *see McDermott v. City of New York*, 50 N.Y.2d 211, 217, 248 N.Y.S.2d 643 (1980) ("The classic situation giving rise to a claim for indemnity is where one, without fault on its own part, is held liable to a third party by operation of law due to the fault of another").  In the instant action the State has incurred expenses to perform a duty primarily owed by the individuals or entities involved with the release of hazardous substances, namely the alleged defendant PRPs.  (Amended Compl. ¶¶ 121-126).  The State alleges that the defendants have an obligation to the State and the public at large to remediate the release and/or the threatened release of hazardous substances at and from their respective facilities and off-site in and around the Bowling Green public water supply wells and to reimburse the State for the funds

29

it expended to remediate the Site. (*Id.*). Viewing the plaintiffs' factual allegations as true for purposes of this motion, plaintiffs have stated a claim for indemnity. *See Stewart's Ice Cream Co.*, 64 N.Y.2d at 88, 484 N.Y.S.2d at 812.

Section 115 of the Restatement of Restitution defines a cause of action for restitution as follows:

> A person who has performed the duty of another by supplying things or services although acting without the other's knowledge or consent, is entitled to restitution from the other if (a) he acted unofficiously and with intent to charge therefor, and (b) the things or services supplied were immediately necessary to satisfy the requirements of public decency, health or safety.

Restatement of Restitution, § 115. "Unlike a claim for indemnity, a plaintiff seeking restitution need not have been under a duty to perform that for which restitution is sought but, rather, that such party because there was an immediate necessity to protect "public decency, health or safety," took action to fulfill a duty actually owed by the defendant. While traditionally, it was necessary that plaintiff have acted voluntarily, it has been held that it is not fatal to a cause of action for restitution that the plaintiff may have also have had a statutory duty to act." *City of New York v. Lead Industries Ass'n*, 644 N.Y.S.2d 919, 923, 222 A.D.2d 119, 126 (1st Dep't 1996); *see State of New York v. Schenectady Chemicals*, 479 N.Y.S.2d 1010, 103 A.D.2d 33 (3rd Dep't 1984).

The State alleges that defendants had and have a duty to abate the public nuisances that exist in and around their respective facilities and at and around the Bowling Green public water supply wells and to remediate the contamination and that the State has discharged and will continue to discharge the duty of defendants to abate these nuisances. (Amended Compl. ¶¶ 1, 115-120). By discharging defendant's duty to abate the nuisances and taking remedial measures

30

to protect the safety of the public and the environment of the State, plaintiffs allege that they have conferred a benefit upon defendants. *Id.* Viewing these allegations in the amended complaint as true for purposes of this motion, plaintiffs have stated a cause of action for restitution.

The statute of limitations for an action for common-law indemnity is six years, and the limitations period for a cause of action for restitution arising out of claims for unjust enrichment is also six years. C.P.L.R. § 213(1)-(2); *see Stewart's Ice Cream Co.*, 64 N.Y.2d at 86, 484 N.Y.S.2d 810; *McDermott*, 50 N.Y.2d at 219, 248 N.Y.S.2d 643; *see also State of New York v. Speonk Fuel, Inc.*, 762 N.Y.S.2d 674, 675-76, 307 A.D.2d 59, 60-61 (3rd Dep't 2003); *Lead Industries*, 644 N.Y.S.2d 919, 222 A.D.2d at 129. In the case of an action for indemnity, "[t]he statute of limitations accrues when the loss is suffered by the party seeking indemnity," *McDermott*, 50 N.Y.2d at 219, 248 N.Y.S.2d 643, and in a restitution cause of action, limitations periods begins to run "upon the occurrence of the wrongful act giving rise to the duty" to repay, *Congregation Yetev Lev D'Satmar*, 596 N.Y.S.2d 435, 437, 192 A.D.2d 501, 503 (2nd Dep't 1993). The triggering act in both cases would be "the State's expenditure of funds in connection with the remedial program." *Hickey's Carting*, 380 F. Supp.2d at 121; *see McDermott*, 50 N.Y.2d at 219, 248 N.Y.S.2d 643 ("accrual occurs upon payment by the party seeking indemnity"); *Speonk Fuel, Inc.*, 762 N.Y.S.2d at 676, 307 A.D.2d at 62 ("the statutory period from which this claim shall be deemed to commence is from the time that a payment was made from the Fund for cleanup and removal costs"); *State of New York v. Ackley*, 734 N.Y.S.2d 722, 723-24, 289 A.D.2D 812, 814-15 (3rd Dep't 2001) (same).

Inasmuch as the record is inadequate with respect to the fact question of when the State's expenditure of funds occurred in connection with its remedial program, the Court finds that

dismissal of the State's common law claims for indemnity and restitution against defendants is premature at this juncture. Accordingly, this Court respectfully reports and recommends that defendants' motion to dismiss plaintiffs' indemnity and restitution causes of action on these grounds be denied.

## CONCLUSION

Based on the foregoing, this Court respectfully reports and recommends that defendants and defendant Chopra's motions to dismiss be granted in part and denied in part.

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of the Court with a copy to the undersigned within fifteen (15) days of the date of this Report. Failure to file objections within this period waives the right to appeal the District Court's Order. *See* 28 U.S.C. 636 (b)(1); Fed. R. Civ. P. 72, 6(a), 6(e); *Beverly v. Walker*, 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 299 (2d Cir. 1992).

Dated:      Central Islip, New York
            February 15, 2007


                                    _____
                                    MICHAEL L. ORENSTEIN
                                    United States Magistrate Judge