UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
NEXT MILLENNIUM REALTY, L.L.C. and
101 FROST STREET ASSOCIATES,

                        Plaintiffs,                    **MEMORANDUM AND
ORDER**

        -against-                             CV 03-5985 (ARL)

ADCHEM CORP., LINCOLN PROCESSING CORP.,
NORTHERN STATE REALTY CORP., NORTHERN
STATE REALTY CO., and PUFAHL REALTY CORP.,

                        Defendants.
-------------------------------------------------------------------X
ADCHEM CORP., LINCOLN PROCESSING CORP.,
NORTHERN STATE REALTY CORP., NORTHERN
STATE REALTY CO., and PUFAHL REALTY CORP.,

                        Third-Party Plaintiffs,

        -against-

THE ESTATE OF JERRY SPIEGEL, and ALAN
EIDLER, PAMELA SPIEGEL SANDERS, and
LISE SPIEGELWILKS, as Executors of the
Estate of Jerry Spiegel,

                        Third-Party Defendants.
-------------------------------------------------------------------X
**LINDSAY, Magistrate Judge:**

     Plaintiffs Next Millennium Realty, L.L.C. and 101 Frost Street Associations

("plaintiffs"), who are the current owners of 89 Frost Street, 101 Frost Street and 770 Main Street

properties located in North Hempstead, New York (the "Frost Street Properties" or the "Site"),

commenced this action against defendants Adchem Corp., Lincoln Processing Corp.("Lincoln"),

Northern State Realty Corp., Northern State Realty Co. ("NRS Co.") and Pufahl Realty Corp.

("Pufahl Realty" or the "Tenant") (collectively "defendants") pursuant to the Comprehensive

Environmental Response Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq.

("CERCLA") for contribution for past and future environmental response costs under §§ 9607 and 9613(f)(3)(B) and a declaratory judgment under §§ 9607 and 9613(g)(2) holding defendants jointly and severally liable for future response costs to be incurred by plaintiffs. In addition, plaintiffs assert a nuisance claim pursuant to state law. The parties have consented to the undersigned's jurisdiction pursuant to 28 U.S.C. § 636. Before the court are (1) plaintiffs' motion for partial summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56; and (2) defendants' cross-motion for partial summary judgment pursuant to Rule 56. The court finds the motions fully briefed and oral argument unnecessary. For the reasons set forth below, plaintiffs' motion is denied, and defendants' cross-motion is granted.

## BACKGROUND

This case arises from the release of perchloroethylene ("PCE") and other contaminants from a building located at 89 Frost Street in 1976 (the "89 Frost Street Site"). The following facts, drawn from the Complaint and the parties' respective Local Civil Rule 56.1 ("Rule 56.1") Statements of Facts, are undisputed, unless otherwise noted.

### (1)    Plaintiffs' Remediation of the Site

The New York State Department of Environmental Conservation ("NYSDEC") designated the Frost Street Properties as State Superfund Sites, including the 89 Frost Street Site. (Defs. 56.1 Counter Stmt. ¶ 1.) The Records of Decisions ("RODs") for the Frost Street Properties identify PCE as a major contaminant of concern that has been released at the 89 Frost Street Site. (*Id.* at ¶¶ 2-3.) Plaintiffs entered into three Consent Orders with the NYSDEC agreeing to remediate the 89 Frost Street Site ("Consent Orders"). (*Id.* at ¶ 4.) Plaintiffs have

2

incurred costs remediating the 89 Frost Street Site pursuant to the Consent Order obligations.

(*Id.* at ¶ 5.)

**(2)      Lease Agreement for 89 Frost Street Site**

On April 1, 1966, Jerry Spiegel ("Spiegel" or the "Landlord"), the then owner of the 89

Frost Street Site, entered into a lease with a purchase option with defendant Pufahl Realty, a real

estate management company, for the 89 Frost Street Site (the "Lease Agreement" or the

"Lease").  (*Id.* at ¶¶ 7-8.)  The Lease was drafted using a standard "Blumberg Improved Gilacy

Form Lease" with two addenda, and the lease was for a 20-year term, which was a standard term

for an industrial tenant.  (Defs. 56.1 Stmt. ¶¶ 56, 63-64; Pls. 56.1 Counter Stmt. ¶¶ 56, 63-64.)

The Lease is a typical commercial lease reflecting the usual relationship between a landlord and a

single industrial tenant.[1]  (Defs. 56.1 Stmt. ¶ 57.)  The Lease provided that in the event the

Tenant remained in the premises at the expiration of the term of the lease, "such holding over

shall not constitute a renewal or extension of the term but such holding over shall be construed as

a tenancy from month to month."  (Maldonado Decl., dated January 28, 2014, Ex. 3 at ¶ 59.)  The

lease was a triple net lease, obligating Pufahl Realty to pay utility costs, insurance, assessments

and taxes, except for inheritance, transfer or corporate franchise taxes.  (*Id.* at ¶¶ 28, 30, 35; Pls.

56.1 Counter Stmt. ¶¶ 99-101.)  At the end of the lease term, the Lease provided that Pufahl

Realty return the leased premises to the landlord "in good order or condition, damages by the

elements excepted, and reasonable wear and tear excepted."  (Pls. 56.1 Counter Stmt. ¶ 66.)

During the Lease term, Spiegel had the authority to assign his interests under the Lease, to

---

[1]Plaintiffs did not provide any facts or evidence to dispute that the Lease is "typical" but
state that the characterization of the Lease as "typical" or "usual" by experts in this case is of no
import.  (Pls. 56.1 Counter Stmt. ¶ 57.)

mortgage the underlying property, or to alienate the 89 Frost Street site.  (*Id*. at ¶ 73.)

Pursuant to the terms of the Lease Agreement, the Landlord agreed to construct a manufacturing facility on the 89 Frost Street Site that met the specifications approved by the Tenant.[2]  (Defs. 56.1 Counter Stmt. ¶ 11.)   In the event that Spiegel was unable to obtain a mortgage on the Property to finance the construction of the building within six weeks of the date of the Lease, the Landlord had the right to terminate the Lease.  (Pls. 56.1 Counter Stmt. ¶ 76.) In addition, Spiegel had the right to terminate the Lease if Pufahl Realty did not agree to any new or altered terms of the Lease imposed by a mortgagee. (*Id.* at ¶ 77.)  On May 24, 1966, Spiegel obtained a mortgage from the Prudential Insurance Company ("Prudential"), and as required under the Lease terms, Pufahl Realty entered into a "certificate and agreement" with the Landlord and Prudential, whereby certain terms of the Lease were altered for the benefit of Prudential (the "Mortgage").  (*Id.* at ¶ 78.)  The Mortgage identified Spiegel as "the present owner in fee simple" of 89 Frost Street.  (*Id.* at ¶ 79.)

The Lease provided that "any and all loans . . . made by the Tenant from any one of or more of the stockholders, officers and/or directors of said tenant, shall be subordinate to this lease . . . and all mortgages."[3]   (*Id*. at ¶ 97.)  Moreover, the Lease prohibited the tenant's interest from constituting a lien and stated that it remained subordinate to Spiegel's mortgage.  (*Id*. at ¶ 98.)

Although Pufahl Realty could assign the Lease or sublease the premises, it could do so

---

[2]The parties dispute whether the building at the 89 Frost Street Site was constructed prior to the execution of the Lease Purchase Agreement.  (*Id.* at ¶ 11; Pls. 56.1 Stmt. ¶ 11.)

[3]This provision was made self-executing and appointed Spiegel as Pufahl Realty's "attorney in fact."  (*Id.*)

subject to the following conditions: (i) the Tenant remained liable under the original Lease for the entire term; (ii) any assignee assumed all Lease conditions; (iii) any assignment was recordable. (*Id.* at ¶¶ 104-05.) In addition, the Mortgage required that the Tenant assign the lease to its purchaser or successor in the event that all or substantially all of the Tenant's assets or business were sold or transferred. (*Id.* at ¶¶ 80, 106.)

During the first two Lease years, Spiegel was obligated to make all repairs to the building and all enumerated structural repairs thereafter, except those caused by the tenant.[4] (*Id*. at ¶ 94.) Pufahl Realty was obligated to make all non-structural repairs commencing in the third year of the Lease; if the tenant failed to do so, Spiegel could enter the premises and perform repairs at the tenant's expense or declare a default. (*Id*. at ¶ 95.) The Lease also granted (i) Spiegel the right to enter the premises to make repairs; (ii) Spiegel and his agents the right to enter the premises at all reasonable hours for the purposes of inspection and making repairs; and (iii) nineteen years and three months into the lease term, the right to enter the premises to advertise the building for sale and rent and to show the Site to prospective purchasers or tenants. (*Id.* at ¶¶ 88-90.)

The Lease permitted the Tenant to "use and occupy the premises only for the lamination and coating of papers, textiles and fabrics and for general manufacturing purposes not in violation of" local zoning. (*Id*. at ¶ 59.) The Lease contained certain restrictions regarding the Tenant's occupancy of 89 Frost Street. For example, the Lease prohibited Pufahl Realty (i) from making alterations to the premises without the written consent of the Landlord; (ii) from

---

[4]Pufahl Realty was originally permitted to make repairs that the Landlord should have made but had failed to make, after giving fifteen days' written notice to Spiegel; however this provision was deleted by the Mortgage agreement. (*Id*. at ¶ 96.)

committing waste or injury to the premises; (iii) from encumbering or obstructing the sidewalks or hallways, doing anything that would increase the cost of fire insurance or posting signs except in compliance with Spiegel's terms; (iv) from performing or allowing any other person to perform any activity that would increase the cost of fire insurance; and required the Tenant to (v) "keep the grass trimmed and maintain the grounds in presentable condition and . . . keep sidewalks and entrance ways unobstructed;" and (vi) to keep the premises free and clear of all cuttings, rubbish, waste paper, ice and snow and other waste material. (*Id*. at ¶¶ 67, 70, 71, 72, 75.)

Pufahl Realty had the right to remove improvements to the premises subject to the requirements that (i) Spiegel be informed, in writing, via certified or registered mail, 30 days in advance of the proposed removal, and (ii) Pufahl Realty first deposit with the Landlord any increase in the security deposit necessary to cover the costs of restoring the premises after removal of improvements. (*Id*. at ¶ 68.) The Lease further provided that any such increases in the security deposit "shall in no way release the Tenant from the obligations and liability for restoration and repair of the premises." (*Id*.)

The Lease required Pufahl Realty to maintain liability and boiler insurance protecting the Landlord and to reimburse Spiegel for fire insurance premiums on 89 Frost Street for the Landlord's benefit in the form of additional rent. (*Id*. at ¶¶ 102-03.) Pufahl Realty's failure to do so would constitute a default and permit the Spiegel to terminate the lease. (*Id*.) Pursuant to its terms, Spiegel could also terminate the Lease (i) in case of fire or other damage to the building; and in the event that the building was destroyed, the Lease permitted the Landlord, at his sole discretion, to rebuild the premises or to terminate the Lease; (ii) upon total condemnation of the

demised premises, or condemnation of a portion of the demised premises that substantially affected the Tenant's use of its equipment and machinery[5]; and (iii) upon any default of the Tenant.[6] (*Id.* at ¶¶ 81, 82, 85.) To enforce its terms, the Lease provided Spiegel the rights to enter and inspect the premises, declare tenant defaults and to use summary proceedings or ejectment against the lessees. (*Id.* at ¶ 85.)

The Lease contained an option to purchase the premises in the twelfth year[7] of the Lease provided that the tenant had "fully and completely performed all of the [Lease] terms and conditions." (*Id.* at ¶¶ 91-93.)

### (3) Operations at the 89 Frost Street Site

Shortly after the Property's certificate of occupancy was issued in August 1966, Lincoln[8], a textile processor, subleased and operated at 89 Frost Street until about 1972. (*Id.* at ¶¶ 107-09.) On March 25, 1969, Pufahl Realty changed its name to Northern State Realty Corp., and on May

---

[5]The Lease provided that, in the event of such condemnation and termination, Pufahl Realty lost all interest in the premises without any part of the condemnation award, and in the instance of condemnation, Pufahl Realty "shall have no claim against the [L]andlord for the value of any unexpired term in said [L]ease." (*Id.* at 82.)

[6]In the event of a default, the Lease provided that Spiegel the right to re-enter the premises "by force, summary proceeding or otherwise and to remove all persons therefrom without being liable to prosecution . . . and the Tenant . . . waives the service of notice in writing." (*Id*. at ¶ 86.)

[7]Spiegel set an option price of $490,000 based on his calculation that he would have substantially recouped his Site investment in the twelfth Lease year. (*Id*.)

[8]Charles Pufahl, Joseph Pufahl and Herman Pufahl (collectively the "Pufahl Brothers") were the shareholders, officers and directors of Lincoln from approximately 1961 until the dissolution of Lincoln in approximately 1977. (*Id.* at ¶ 13.)

21, 1973, Northern State Realty Corp. assigned the Lease to NSR Co.[9], a general partnership that managed real property. (Defs. 56.1 Counter Stmt. ¶¶ 9-10.) The Pufahl Brothers were the partners of NSR Co. from its formation in 1973 until the death of Herman Pufahl in 1995. (*Id.* at ¶ 13.)

On May 22, 1973, NSR Co. subleased 89 Frost Street to 89 Frost Street Leasing Co. for a term to commence June 1, 1973 (the "Sublease"). (Pls. 56.1 Counter Stmt. ¶ 15.) Pursuant to a rider to the Sublease, 89 Frost Street was occupied by Marvex Processing and Finishing Corporation ("Marvex"), a non-party dissolved corporation, from 1973-76. (*Id.*) Marvex installed a dry cleaning machine at the site that was connected to an above-ground storage tank that contained PCE, which was regularly refilled via tanker truck delivery. (*Id.* at ¶¶ 16, 122.) Marvex's dry cleaning machine was connected to a solvent still, and Marvex stored 55-gallon drums at the site during the term of the Sublease. (*Id.* at ¶¶ 123-24.)

On May 30, 1976, there was a fire at 89 Frost Street which destroyed the manufacturing area of the site, including Marvex's dry cleaning machine (the "1976 Fire"). (*Id.* at ¶¶ 128-29.) The PCE released in the fire was released to the subsurface at 89 Frost Street via floor drains. (*Id.* at ¶ 131.) Marvex's foreman was convicted of arson in connection with the 1976 fire. (*Id.* at ¶ 133.) It is undisputed that either through its manufacturing activity or following the fire, Marvex contributed PCE to the 89 Frost Street Site.

(4)     **Post Fire Litigation and Release**

The 1976 Fire occurred in the tenth year of the Lease, two years before the Tenant's

---

[9]Defendants Pufahl Realty, Northern State Realty Corp. and NSR Co. are referred together as "Lessee Defendants."

option to purchase 89 Frost Street vested.  (*Id*. at ¶ 134.)  On June 24, 1976, Spiegel sent NSR

Co. a letter giving notice that the Lease had terminated on May 30, 1976 pursuant to its terms.

(*Id*. at ¶ 135.)  In addition, Spiegel sent a letter to Marvex informing Marvex that the Lease had

been terminated and demanding that Marvex remove its property from the premises.  (*Id*.)  On

July 1, 1976, NSR Co. sued Spiegel and Allendale Insurance Company (the issuer of the fire

insurance policy for the 89 Frost Street Site), seeking a declaration that the Lease purchase option

had not been terminated or an order directing Allendale Insurance Company to either pay the

insurance proceeds to NSR Co. or to Spiegel with the stipulation that Spiegel would use the

proceeds to rebuild 89 Frost Street.  (*Id*. ¶¶ 137-38.)   In 1977, the litigation settled with the

execution of six collateral agreements between the parties, Northern State Realty Corp., Lincoln

and Adchem.  (*Id*. at ¶ 145.)    The settlement provided in relevant part for (i) the termination of

the Lease; (ii) Allendale Insurance Company to issue the $855,000 in fire insurance proceeds to

Spiegel; (iii) payment of $75,000 to NSR Co. by Spiegel; (iv) five-year extensions of the leases

on two other properties; and (v) a  release from Spiegel and his successors and assigns.  (*Id*. ¶¶

145-152.)

> The release executed by Spiegel released defendants and their
>
> respective heirs, executors, administrators, successors and assigns from all
> actions, causes of action, suits, debts, dues, sums of money, account reckonings,
> bonds, bills, specialties, covenants, contracts, controversies, agreements,
> promises, variances, trespasses, damages, judgments, extents, executions, claims,
> and demands, whatsoever, in law, admiralty or equity, which against the
> Releasees, the Releasor's heirs, executors, administrators, successors and assigns
> ever had, now have or hereafter can, shall or may, have for, upon or by reason of
> any matter, cause or thing whatsoever from the beginning of the world to the day
> of the date of this Release, arising out of and in connection with a certain lease
> dated April 1, 1966 made between JERRY SPIEGEL, as landlord and PUFAHL
> REALTY CORP., as tenant covering the premises described in Schedule A

annexed to said lease and known as and by number 89 Frost Street, New Cassel, Town of Hempstead, County of Nassau, State of New York, including but not limited to a certain option granted to the tenant to purchase said property as more fully provided in paragraph 65 of said lease an any and all other terms, covenants, conditions and obligations contained in said lease and with respect to a certain action commenced in the Supreme Court, Nassau County, by NORTHERN STATE REALTY CO., plaintiff against JERRY SPIEGEL, Allendale Mutual Insurance Company and Factory Mutual Insurance Company, defendants bearing index number 10154/76, which action settled on April 20, 1977 before Mr. Justice William J. Sullivan, presiding in Special Term Part V-B of said Court, pursuant to a stipulation of settlement entered into and consented to by all parties to the aforementioned action in open Court before Justice Sullivan.

(*Id*. ¶ 147.)

Spiegel reconstructed the building at 89 Frost Street in 1978. (*Id*. ¶ 153.) Spiegel and/or his successors have continued to lease the new building at the site until 1998 when it was demolished to make way for a department store. (*Id*. ¶¶ 154-55.)

Plaintiffs commenced the instant action[10] on November 24, 2003 in the United States District Court for the Eastern District of New York (Feuerstein, *D.J.*) against defendants (1) seeking response costs under § 113(f)(1) of CERCLA for the 89 Frost Street Site; 101 Frost Street Site; and 770 Main Street Site; (2) contribution costs incurred pursuant to the terms of the Consent Orders pursuant to § 113(f)(3)(B); (3) a declaratory judgment pursuant to § 113(g)(2)

---

[10]*State of New York et al. v. Next Millenium Realty, LLC et al.,* CV 06-1133 (SJF)(MLO) was consolidated into lead case, *Next Millenium Realty, LLC et al. v. Adchem Corp. et al.,* CV 03-5985 on May 4, 2006 as related actions. *Order*, dated May 4, 2006 (Feuerstein, *D.J.*). Case number CV 06-1133 was administratively closed by *Order,* dated May 4, 2006. *Id.* Thereafter, the two actions were severed for all purposes on September 8, 2010, and the Clerk of the Court was directed to reopen the case entitled *State of New York et al. v. Next Millenium Realty, LLC et al.,* under docket number CV 06-1133. *Order*, dated September 8, 2010 (Feuerstein, *D.J.*). Thereafter, Magistrate Judge Orenstein retired and the undersigned was assigned as the magistrate judge on the cases. On July 26, 2012, the parties in the case entitled *Next Millenium Realty, LLC et al. v. Adchem Corp. et al.,* CV 03-5985 consented to the undersigned's jurisdiction pursuant to 28 U.S.C. § 636 and the case was reassigned for all purposes. (Docket Entry Nos. 646, 648.)

holding defendants liable to past, current and future cleanup costs for the 89 Frost Street Site; and (4) damages for common law nuisance for the three sites. (Compl., dated November 24, 2003). Plaintiff amended the Complaint to add new parties on May 20, 2008. (Am. Compl., dated May 20, 2008.) Although plaintiffs filed a motion for leave to amend the complaint and proposed a Second Amended Complaint on February 1, 2008, the court neither accepted nor approved it, and it was denied as moot. (Docket Entry Nos. 249, 644.) The parties entered a Stipulation wherein the plaintiffs agreed *inter alia* to file an amended complaint which would limit the recovery sought to response costs and damages arising from alleged groundwater contamination on the Frost Street Sites and dismiss all of their claims against the Upgradient Defendants. (Docket Entry No. 644.) Plaintiffs filed a Third Amended Complaint on July 12, 2012. (Third Am. Compl., dated July 12, 2012.)

Plaintiffs now move for partial summary judgment on the First, Second and Third Causes of Action contained in the Third Amended Complaint pursuant to Fed. R. Civ. P. 56 for judgment on liability against the Lessee Defendants[11] as "owners" under CERCLA, 42 U.S.C. § 9601 *et seq*. Defendants now cross move for partial summary judgment on the First, Second and Third Causes of Action contained in the Third Amended Complaint pursuant to Fed. R. Civ. P. 56 for judgment dismissing plaintiffs' claims that the Lessee Defendants are liable as "owners" under CERCLA.

---

[11]Plaintiffs' motion specifies that it seeks a judgment on liability against defendant NSR Co., but notes that [a]ll defendants are related entities with common beneficial ownership, management and involvement." (Pl. Mem. of Law, at 2 & n.1.) Moreover, the Third Amended Complaint refers to the defendants as having "sufficient indicia of ownership to be *de facto* owners under CERCLA" by virtue of the lease agreement. (Third Am. Compl., ¶ 51.) Thus, for clarity in establishing CERCLA liability, the court will refer to the appropriate defendants as the Lessee Defendants.

**DISCUSSION**

I.     **Applicable Law and Legal Standards**

    A.     **Summary Judgment**

Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue of fact is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion," *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir. 1995) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam)); *see Dickerson v. Napolitano*, 604 F.3d 732, 740 (2d Cir. 2010) (same), and "when cross-motions for summary judgment are filed, against the party whose motion is under consideration," *Tindall v. Poultney High Sch. Dist.*, 414 F.3d 281, 284 (2d Cir. 2003) (internal quotation marks and citations omitted)).

Once the moving party has met its burden, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting FED. R. CIV. P. 56(e)); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). The nonmoving party cannot survive summary

judgment by casting mere "metaphysical doubt" upon the evidence produced by the moving party. *Matsushita*, 475 U.S. at 586. Summary judgment is appropriate when the moving party can show that "little or no evidence may be found in support of the nonmoving party's case." *Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1223-24 (2d Cir. 1994) (citations omitted). However, "the judge's role in reviewing a motion for summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo*, 22 F.3d at 1224.

## B.     CERCLA

"CERCLA is a comprehensive federal law governing the remediation of sites contaminated with pollutants." *Consolidated Edison Co. of N.Y. v. UGI Utilities, Inc.,* 423 F.3d 90, 94 (2d Cir. 2005). CERCLA's "primary purposes are axiomatic: (1) to encourage the timely cleanup of hazardous waste sites; and (2) to place the cost of that cleanup on those responsible for creating or maintaining the hazardous condition." *W.R. Grace & Co.-Conn. v. Zotos Int'l, Inc.*. 559 F.3d 85, 88 (2d Cir. 2009) (internal quotation marks and citations omitted). "To effectuate these goals, CERCLA looks backward in time and imposes wide-ranging liability." *Marsh v. Rosenbloom,* 499 F.3d 165, 178 (2d Cir. 2007). Thus, absent the availability of one of CERCLA's affirmative defenses, "the statute imposes strict liability on owners and facility operators, on persons who arranged for the disposal or treatment of hazardous waste at the relevant site, and on persons who transported hazardous waste to the site," often collectively

referred to as potentially responsible parties.[12]  *Price Trucking Corp. v. Norampac Indus., Inc.*, 748 F.3d 75, 79 (2d Cir. 2014) (citing 48 U.S.C. § 9607(a)(1)-(4)).  CERCLA, however, "provide[s] property owners an avenue of reprieve; it allows them to seek reimbursement of their cleanup costs from others in the chain of title or from certain polluters – the so-called potentially responsible parties." *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.,* 596 F.3d 112, 120 (2d Cir. 2010).  For purposes of the within cross motions for partial summary judgment, the relevant avenue of reprieve is 42 U.S.C. § 9607(a)(4)(A)-(B), which provides for cost recovery actions by private parties against potentially responsible parties.  42 U.S.C. § 9607(a).

Under CERCLA, a person is liable as a past "owner" or "operator" if he "at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." *Id.* § 9607(a)(2).  The term "owner or operator" is unhelpfully defined "only by tautology . . .  as 'any person owning or operating' a facility." *United States v. Bestfoods,* 524 U.S. 51, 56 (1998) (quoting 42 U.S.C. § 9601(20)(A)(ii)).  "It is settled in this

---

[12]CERCLA defines four classes of persons as potentially responsible parties:

(1) the owner and operator of a vessel or facility, (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance.

42 U.S.C. § 9607(a)(1)-(4).

circuit that owner and operator liability should be treated separately." *Commander Oil Corp. v. Barlo Equipment Corp.,* 215 F.3d 321, 328 (2d Cir. 2000); *cf. Bestfoods,* 524 U.S. at 64 ("If the Act rested liability entirely on ownership of a polluting facility, this opinion might end here; but CERCLA liability may turn on operation as well as ownership").

"To make out a prima facie case for liability under the Act, a plaintiff must establish that: (1) the defendant is an 'owner' or is otherwise liable under 42 U.S.C. § 9607(a)(1)-(4); (2) the site is a 'facility' as defined by 42 U.S.C. § 9601(9); (3) there has been a release or threatened release of hazardous substances at the facility; (4) the plaintiff incurred costs responding to the release or the threat; and (5) the costs and response conform to the National Contingency Plan." *Price Tracking Corp.*, 748 F.3d at 79 -80 (citations omitted). For purposes of the parties' cross motions for partial summary judgment, the only contested issue is whether the Lessee Defendants are "owners" within the meaning of 42 U.S.C. § 9607(a)(1).

## II.     Plaintiffs' and Defendants' Cross Motions for Partial Summary Judgment

Plaintiffs contend that the Lessee Defendants had sufficient indicia of ownership pursuant to the terms of the Lease to be liable as *de facto* "owners" under CERCLA for clean-up costs caused by the actions of the Subtenant.[13] Defendants disagree and maintain that the Lease was a typical commercial lease and as such their status as a lessee/sublessor did not make them liable as *de facto* "owners" within the meaning of CERCLA. Alternatively, defendants assert that even if the Lease did give rise to owner liability, Spiegel released defendants from CERCLA liability. Both parties agree that the Second Circuit's decision in *Commander Oil Corp. v. Barlo Equip.*

---

[13]Plaintiffs also allege that defendants are liable as "operators" under 42 U.S.C. § 9607(a). Although defendants deny such allegations, neither plaintiffs nor defendants have moved for summary judgment on that issue at this time.

15

*Corp.*, 215 F.3d 321 (2d Cir. 2000) is dispositive of this issue.

In *Commander Oil*, the Second Circuit analyzed as a question of first impression, whether, and under what circumstances, a lessee/sublessor may be held liable as an "owner" under CERCLA for contamination that a sublessee caused. 215 F.3d at 330-31. In that case, Commander Oil owned two lots in Nassau County. Lot 7A was an office and warehouse space, and Lot 7B was a fuel depot. *Id.* at 324. Commander Oil leased Lot 7A to Barlo Equipment Corp. ("Barlo") and Lot 7B to Pasley Solvents & Chemicals ("Pasley"). *Id.* at 325. Commander Oil thereafter consolidated the leases, and under a single new lease rented both lots 7A and 7B to Barlo. *Id.* Barlo then subleased Lot 7B to Pasley. *Id.* "This arrangement simplified Commander Oil's bookkeeping and also delegated responsibility to Barlo for basic maintenance and payment of taxes on both lots." *Id.* The Nassau County Department of Health ("DOH") discovered pollution on Lot 7B, and the EPA sought reimbursement from Commander Oil for response costs incurred by the government in remediating the site. *Id.* In turn, Commander Oil sued Barlo and Pasley for contribution under CERCLA. *Id.* The district court held that Barlo was an "owner" within the meaning of § 9607(a)(1) by virtue of its status as the parcel's lessee/sublessor under the consolidated lease, and following a bench trial apportioned liability between Commander Oil and Barlo because Pasley was "financially irresponsible." *Id.* at 325-26. The Second Circuit reversed, holding *inter alia* that (i) as an issue of first impression site control alone is an improper basis for the imposition on lessees/sublessors of owner liability under CERCLA; and (ii) the lessee lacked sufficient attributes of ownership to be liable as an owner under CERCLA. *Id.* at 330-32.

In doing so, the Second Circuit considered "whether and under what circumstances, the

rights possessed by a lessee are sufficient to rise to the level of 'ownership' for CERCLA

purposes." *Id*. at 328-29. The Court first noted the distinction between "owner" liability and

"operator" liability and rejected the notion of imposing liability on a lessee or sublessor based on

site control, stating "imposing *owner* liability instead of *operator* liability threatens to conflate

two statutorily distinct categories of potentially responsible parties." *Id*. at 328 (emphasis in

original). The Court explained:

> If control over a facility could establish ownership then operator liability in these
> circumstances would be just a subset of owner liability. Imposing owner liability
> on the basis of site control threatens to make owners of all operators and
> surplusage of most of operator liability. . . . Because we strive to avoid
> redundancy in our interpretation of statutes, we believe that site control alone is an
> improper basis for the imposition of owner liability. Lessees may frequently be
> liable as operators but most lessees are not owners within the meaning of §
> 9607(a).

*Id*. at 328-29.

The Court next recognized that "[w]hile the typical lessee should not be held liable as an

owner, there may be circumstances when owner liability for a lessee would be appropriate." *Id*.

at 329. The Court emphasized that the critical relationship for identifying owner liability is the

relationship between the owner/lessor and the lessee/sublessor, explaining

> [o]wnership exists vis-a-vis someone else; it represents a priority of rights and
> claims and not a concrete status. Lessees/sublessors necessarily have
> relationships with both the original lessor – often the record owner– and the
> sublessee. A lessee/sublessor has many of the rights and obligations of ownership
> in relation to the sublessee; he usually retains, *inter alia*, the power to lease, to
> exclude, and to govern the terms of property's use. But lessees/sublessors are
> simply lessees in relation to the original owner/lessor, incapable of granting to a
> sublessee more than they originally acquired from their lessor. Since a typical
> lessee is not liable as an owner, then logically a sublessor should not be liable
> either, unless its status with regard to the sublessee operates somehow to confer
> owner liability. However, we find no basis in CERCLA for supposing that the
> relationship between the sublessor and sublessee is the critical relationship for

identifying owner liability and therefore no principled basis for assuming that a lessee/sublessor's relationship with a sublessee automatically transforms the lessee/sublessor into an owner under § 9607(a). In fact, there are good reasons why this relationship cannot be dispositive for purposes of establishing strict owner liability.

*Id*. Within the lessor/ lessee relationship, the Court acknowledged that "[certain lessees may have the requisite indicia of ownership vis-a-vis the record owner to be *de facto* owners and therefore strictly liable. Such would probably be true of a lessee with the proverbial 99-year lease.[14]" *Id*. at 330.

Finally, the Court declined to "define with specificity those factors that might transform a lessee into an owner," but noted "several that . . . could be important," such as:

> (1) whether the lease is for an extensive term and admits of no rights in the owner/lessor to determine how the property is used; (2) whether the lease cannot be terminated by the owner before it expires by its terms; (3) whether the lessee has the right to sublet all or some of the property without notifying the owner; (4) whether the lessee is responsible for payment of all taxes, assessments, insurance, and operation and maintenance costs; and (5) whether the lessee is responsible for making all structural and other repairs.

*Id*. at 330-31. The Court instructed that "[this non-exclusive list is meant to reinforce the point that the critical question is whether the lessee's status is that of a *de facto* owner and not whether it exercises control over the facility." *Id*. at 331.

Applying these principles to the instant matter, the court concludes that the Lessee Defendants did not possess "a priority of rights and claims" to the bundle of rights associated

---

[14]By way of illustration, the Court provided three rare instances where the lessee did not have a typical lease but instead may have obtained a priority of ownership rights, *viz*. (i) sale-leaseback arrangements . . . if the lessee actually retains most rights of ownership with respect to the new record owner;" (ii) "extremely long-term leases [where], according to the terms of the lease, the lessee retains so many of the indicia of ownership that he is the *de facto* owner" and (iii) "where a lessee/sublessor has impermissibly exploited . . . more rights than he originally leased." *Id*. at 331. None of these exceptions apply to the Lessee Defendants.

with ownership of property under the Lease to be liable as a *de facto* owner. As a threshold matter, the Lease at issue was drafted using a standard Blumberg form lease with two addenda, and appears to be a typical commercial lease between a landlord and a single industrial tenant.[15] The Lease provided for a term of 20 years, which is a standard and usual term for an industrial lease, and the Mortgage, which altered certain terms of the Lease, identified Spiegel as the "present owner in fee simple" of 89 Frost Street.

Moreover, the following Lease provisions make clear that Spiegel (as lessor) possessed a priority of rights and claims over the Lessee Defendants: (i) paragraph 63 provided Spiegel could sell the Site without notifying his tenants; (ii) paragraph 47 reserved any condemnation award to Spiegel; (iii) paragraphs 30 and 36 and lease addendum paragraph 1 required the Lessee Defendants to secure and pay for insurance policies that named Spiegel as a beneficiary and ensured his right to receive insurance proceeds; (iv) paragraphs 19 and 35 required the Lessee Defendants to pay for Spiegel's fire insurance, prohibited defendants from doing acts that would increase the premiums and reserved Spiegel's right (as lessor) to receive such insurance awards; (v) paragraph 5 provided Spiegel the unilateral right to determine whether to rebuild or terminate the lease if the building was destroyed by fire; (vi) paragraph 69 subordinated the Lessee Defendants' past and future loans to their shareholders to Spiegel's ownership interest in 89 Frost Street and to Spiegel's Mortgage; (vii) paragraph 14 provided that the Lessee Defendants' interest in 89 Frost Street would never constitute a lien on the property and at all times remained

---

[15]Defendants proffered two experts, to wit, David Tesler and Jack O'Connor who opined that the Lease was a typical arrangement for a single industrial tenant. (Expert Report of David Tesler, dated May 5, 2013 at 2,6; Expert Report of Jack O'Connor, dated May 15, 2013 at 1-2.) Plaintiffs' expert did not address Tesler or O'Connor's opinion in this regard. (Report of Benjamin Weinstock, dated August 29, 2013.)

subordinate to Spiegel's mortgage; and (viii) paragraph 46 wherein Spiegel's mortgage forced the Lessee Defendants to accept further limitations on their rights or face termination of the Lease. With respect to the accepted Mortgage, paragraphs 10 and 12 further provided that the Lessee Defendants' limited right to exercise the purchase option after twelve years was subordinate to the mortgagee's superior rights and eliminated the tenant's right to withhold rent or charge the owner with repairs if the site was partially damaged.

Spiegel's property rights were further protected by the following provisions which restricted the tenant's use of the site: (i) paragraph 15 of the Lease Addendum limited the tenant's use of the property to lamination and coating of papers, textiles and fabrics and for general manufacturing; (ii) paragraph 19 prohibited any activities that would increase the cost of fire insurance or permit another to do so; (iii) paragraph 10 prohibited the tenant from encumbering or obstructing the sidewalk or permit another to do so; (iv) paragraph 61 prohibited the tenant from committing a waste or injury to the premises; (v) paragraph 58 required the tenant to keep the grass trimmed and maintain the grounds in presentable condition; (vi) paragraph 62 prohibited the tenant from doing any act that could lead to a mechanic's lien on the Site; (vii) paragraphs 11 and 32 prohibited the tenant from posting signs except under the owner's terms; (viii) paragraph 4 prohibited the tenant from altering the site without the owner's written consent; (ix) paragraph 31 prohibited the tenant from removing improvements to the site without 30 days written notice to the owner and any such removal was conditioned on an increase in security deposit to cover the owner's estimated cost of restoration; and (x) paragraph 2 obligated the tenant to return the site in good order and condition at the end of the term. That Spiegel retained extensive rights under the Lease to enforce the provisions and could enter the

premises upon any default of the tenant, make repairs at the tenant's expense, eject a tenant via summary proceedings, show the site to prospective purchasers or inspect it for lease compliance, also cuts against plaintiffs' argument that the Lessee Defendants are *de facto* owners. *Cf. Kaiser Aetna v. U.S.*, 444 U.S. 164, 176 (1979) ("the owner has somehow lost one of the most essential sticks in the bundle of rights that are commonly characterized as property – the right to exclude others"). In short, considered together, these Lease terms do not reflect the requisite indicia of ownership that might transform the Lessee Defendants into owners.

Nevertheless, relying on the five factors enumerated in *Commander Oil,* the plaintiffs argue that the Lessee Defendants had sufficient ownership rights under the Lease to make the Tenant a *de facto* owner. Specifically, plaintiffs argue:

> [t]he Tenant exercised its right to sublet the 89 Frost Street Site without the Landlord's consent, and placed a polluting Subtenant, Marvex, on the Site. The Tenant alone profited substantially from the Sublease. Although the Tenant visited Marvex and noticed that Marvex was conducting dry cleaning operations and storing and using PCE on the property, the Tenant chose to do nothing to prevent the environmental damage caused to the property. Thus, the Tenant had sole responsibility for Marvex, and as such, was in the position to prevent the contamination of the Site. This, coupled with the indicia of ownership that the Tenant enjoyed under the terms of the [Lease], mandates that the Tenant be held liable as *de facto* owner under CERCLA as a matter of law.

(Pls. Reply Mem. of Law at 1-2.)

As a preliminary matter, the relationship between lessee/sublessor defendant NSR Co. and sublessee Marvex is irrelevant to whether NSR Co. can be liable as a CERCLA owner. *See Commander Oil Corp.,* 215 F.3d at 329 ("we find no basis in CERCLA for supposing that the relationship between the sublessor and sublessee is the critical relationship for identifying owner liability"). As the Second Circuit made clear, the "critical relationship is that between the

lessee/sublessor and the owner/lessor." *Id*. at 331. The Court explained that the non-exclusive

five factors enunciated in *Commander Oil* were "meant to reinforce the point that the critical

question is whether the lessee's status is that of a *de facto* owner and not whether it exercises

control over the facility." *Id.*

Moreover, the terms of the lease at issue fail to provide the requisite indicia of ownership

of the Lessee Defendants vis-a-vis Spiegel, the record owner. Generally under CERCLA "the

typical lessee should not be held liable as an owner," and the *Commander Oil* factors that "could

be important" to whether a lease transforms the lessee into an "owner" due to a priority of rights

fail to change the status of the Lessee Defendants as that of a typical lessee. With respect to the

first factor, unlike the proverbial 99-year lease, the term of the lease here was for twenty years, a

standard term for an industrial tenant. By its terms, the lessees were to return the leased premises

to the landlord "in good order or condition, damages by the elements excepted, and reasonable

wear and tear excepted." In the event the lessees remained in the premises at the end of the term,

the lease clearly states that "such holding over shall not constitute a renewal or extension of the

term but such holding over shall be construed as a tenancy from month to month." The terms of

the lease limited the lessees to manufacturing uses, prevented them from engaging in activities

that could increase the cost of fire insurance, prohibited them from altering the site without

Spiegel's written permission, prohibited them from posting a sign except in compliance with

Spiegel's terms, prohibited them from removing leasehold improvements without notice and

escrowing the cost of restoration, obligated them to keep the site in "presentable condition" and

return it "in good order and condition. *See Commander Oil Corp.,* 215 F.3d at 331 (concluding

that Barlo did not possess sufficient attributes of ownership where he was, *inter alia,* "required to

obtain written consent from Commander Oil before making any alterations or improvements" to the property or to display any sign on the property, to "keep the property clean and in order" and "prohibited from doing anything that would in any way increase the rate of fire insurance on the property") (internal quotation marks and citations omitted).

With regard to the second factor, Spiegel could terminate the Lease before the 20-year term and in fact did terminate the Lease midway through its term. Spiegel also had the right to terminate the lease at his option in the first six weeks of the Lease if he did not obtain a mortgage, in the event the building was destroyed by fire or if the Tenant defaulted on any Lease obligation, whereby Spiegel was authorized to institute summary proceedings to terminate the Lease and the Tenant was contractually obligated to waive its right to notice. Indeed Spiegel's unilateral decision to terminate the Lease rather than restore the site's building following the fire prevented the Tenant's continued use of 89 Frost Street and demonstrates the Lessee Defendants' lack of ownership rights. *Cf. Matter of Colleges of the Seneca v. City of Geneva*, 94 N.Y.2d 713, 718 (2000) (describing "the right to determine whether or not to rebuild the [structure] in the case of substantial damage to it" as an "indication of ownership" of the leased building).

The third factor does not transform the lessee into an owner because although the Lessee Defendants had the right to assign or sublet the property without notifying the owner, they could do so only if they remained liable under the Lease, the assignee assumed all Lease conditions, the assignment was recordable and the assignment or sublease did not increase the cost of fire insurance. Thus, even without notice, the Lease preserved Spiegel's rights to the property in the event of a sublease or assignment and authorized Spiegel to enforce such rights directly against the Lessee Defendants. In contrast, Spiegel, as fee simple owner, retained the rights to assign his

Lease interests or mortgage or assign the underlying property during the Lease term. Notably, although the Lease contained a purchase option in the twelfth year of the Lease, the purchase option was never exercised nor came into existence because Spiegel terminated the Lease prior to the option's effective date.

As to the fourth factor, the Lessee Defendants held a common triple net lease which required them to pay certain taxes, assessments, utilities and insurance costs. However, Spiegel was obligated to pay inheritance, transfer and corporate franchise taxes which is consistent with taxes that are incident to ownership, such as the right to convey or transfer the property. Finally, the fifth factor lends no support to transforming the tenant to a *de facto* owner. The Lease provides that Spiegel was responsible for all repairs during the first two years and all structural repairs thereafter, except those caused by the tenant's act or neglect. The Lessee Defendants were responsible for non-structural repairs.

In summary, under the Lease the Lessee Defendants lacked most of the core bundle of rights that are associated with ownership of property. Given the insufficient attributes of ownership over the 89 Frost Street property, the Lessee Defendants cannot be held liable under CERCLA as a *de facto* owner. Accordingly, the plaintiffs' motion for partial summary judgment is denied, and the defendants' motion for partial summary judgment is granted[16].

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for partial summary judgment is denied, and defendants' motion for partial summary judgement is granted

---

[16]In light of this conclusion, the court need not and does not reach defendants' alternative argument for partial summary judgment.

**SO ORDERED.**

Dated: Central Islip, N.Y.
October 22, 2014

_____/s_____
ARLENE ROSARIO LINDSAY
United States Magistrate Judge